HERBERT SHAFFER ASSOCIATES, INC., Plaintiff-Appellee, *v.* FIRST BANK OF OAK PARK, as Trustee, *et al.*, Defendants-Appellants.

(No. 60391;

First District (3rd Division)—July 17, 1975.

Ancel, Glink, Diamond & Murphy, P. C., of Chicago (Ronald S. Cope, of counsel), for appellants.

Irving T. Zemans, of Chicago, for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Herbert Shaffer Associates, Inc., filed suit in the circuit court of Cook County to foreclose a mechanic's lien for architectural services expended by it in connection with work on a dwelling project in the City of Chicago. Defendants were the legal owner of the property, First Bank of Oak Park, as trustee, and the beneficial owner of the property, Michael Stein. Defendants counterclaimed for a refund of part of the money already paid to plaintiff, alleging that they had overpaid plaintiff on the basis of work completed by it. At the close of all the evidence, the trial court, as trier of fact, entered judgment for plaintiff, assessed damages in the amount of $6,340.32, and dismissed the counterclaim.

Although the voluminous record contains scores of exhibits, the case actually revolves upon the construction of a standard, written architect's contract. It was plaintiff's position at trial that pursuant to that document it was entitled to compensation for work done up to the time defendants terminated the contract. Defendants maintained that they had never terminated the contract and that plaintiff had been overpaid. The pertinent facts are as follows.

The parties entered into a written contract for services on December 17, 1970, although they had been working on an oral agreement since earlier in that year. As stated in the contract, the owners' intention was to erect "a multiple dwelling building consisting of approximately thirty-

seven units located on four stories" at 732-46 Gordon Terrace in Chicago. The contract specified that plaintiff was to prepare drawings for various phases of development of the project. These drawings were to consist of schematic design studies, design development drawings, and working (construction) documents. The manner in which plaintiff was to be compensated for its services is outlined in paragraph II of the contract. In pertinent part that provision reads as follows:

"a. FOR THE ARCHITECT'S BASIC AND ADDITIONAL SERVICES, * * * compensation computed as follows:

Principals' time at the fixed rate of Twenty-Five dollars ($25.00) per hour. * * *

Employees' time computed at a multiple of two & one-half (2½) times the employees' Direct Personnel Expense as defined in Article 4.

Services of professional consultants at a multiple of one and one-quarter (1¼) times the amount billed to the Architect for such services.

          *     *     *

c. FOR THE ARCHITECT'S REIMBURSABLE EXPENSES, amounts expended as defined in Article 5.

d. THE TIMES AND FURTHER CONDITIONS OF PAYMENT shall be as described in Article 6 and as follows:

Compensation for BASIC SERVICES shall be limited to a total of $15,000.00 and shall be due and payable according to the following Schedule of Payment:

On Completion of the Schematic & Design Development Phases:

One Thousand Dollars ($1,000.00)

On Completion of the Construction Documents:

Five Thousand, Five Hundred Dollars ($5,500.00)

During Construction Phase, on reaching roof level, the remainder of the compensation, not to exceed

Eight Thousand, Five Hundred Dollars ($8,500.00)

Compensation for ADDITIONAL SERVICES to be made monthly.

The above Schedule of Payments shall not be applicable under the conditions described in Article 5, paragraph 6.3 hereinafter."

Melvin Kantor, a licensed architect and associate in plaintiff's firm, enjoyed both a business and social relationship with Stein at the time the latter approached him in early 1970 to relate his interest in erecting a high-rise, multiple-unit dwelling on the subject property. A meeting was arranged in February at plaintiff's offices, attended by Kantor, Stein, and

Herbert Shaffer, plaintiff's president. As a result of that and subsequent meetings, Stein engaged plaintiff on a fee basis to prepare some preliminary studies on the economic feasibility of Stein's plan. Sometime between March 13 and 19, plaintiff presented its analysis of the plan, and Stein determined his proposal was economically unfeasible. Stein then instructed plaintiff to study the feasibility of a low-rise dwelling of 37 units. Later in March, Kantor informed Stein that a zoning variation would have to be obtained in respect to the location of the building on the site. Stein replied that zoning would be no problem, that he would secure the zoning change, and that plaintiff should proceed with the preparation of the preliminary designs on the operating premise that the variation had already been secured.

Kantor further testified that the sketches and drawings prepared under his supervision concerning the project were continually being modified and revised by Stein or his financial backers. Stein would appear at plaintiff's office frequently and observe the work being done. Reproductions of the preliminary plans were continually being mailed or given to Stein or his representatives. On October 20, 1970, Kantor appeared and testified on defendants' behalf before the Zoning Board of Appeals. The variation request was denied.

Plaintiff continued to work on the project. On February 6, 1971, a final definitive design plan for the project was complete and was forwarded by transmittal letters dated February 7 and 9. On February 18, Kantor sent Stein a letter verifying that the plans submitted were final. His reason for sending the letter was to prevent further changes by Stein.

Kantor then directed Ronald Ringman, another licensed architect and associate in plaintiff's firm, to begin preparation of working drawings. Stein had asked to have those drawings prepared as soon as possible. Under Kantor's supervision, Ringman prepared definitive working drawing sketches of the project between February 15 and March 5 in connection with the preparation of final working drawings. At the time Stein ordered the work stopped on March 12, the final working drawings were at an incomplete stage.

On cross-examination, Kantor testified that the stage of completion of the working drawings at the time work was stopped could not properly be characterized as partial, although he conceded that a substantial amount of work still remained before they could be considered completed. Kantor further testified that on March 10, 1971, he became aware of certain proposed zoning amendments that would directly affect the project so as to necessitate a variation or a substantial change in the plans.

Ronald Ringman, the principal draftsman of the working drawings,

testified that to a certain degree the preliminary and working drawings bear similarities. He noted that substantial progress can be made in the preparation of working drawings without a final preliminary drawing and without final structural calculations.

Herbert Shaffer, plaintiff's president, testified that he makes it a practice to enter into a business log notes of important visits, telephone calls, and meetings at work. He used this log to refresh his recollection in testifying. After his company began work on plans for a low-rise dwelling project, Shaffer informed Stein that a zoning variation would be needed. Stein stated that he would take care of that problem and told Shaffer to proceed on the basis of their oral agreement.

On March 11, 1971, Shaffer learned that the city council was considering the passage of certain zoning amendments which would affect the plans for the project. Shaffer informed Stein and suggested that it might be to Stein's advantage to stop work until the zoning problem was resolved. The following day Stein ordered plaintiff to stop work. When Shaffer later inquired about the status of Stein's pending request for a zoning variation, Stein replied that the combination of the old zoning problem and the purported passage of the new zoning amendments dictated the submission by him of an amended request for additional zoning relief before the proper authorities. On April 1, Stein asked Shaffer to prepare modified drawings to present to the authorities detailing how his present ones could be revised, and offered to pay plaintiff $500 for the work. Shaffer replied that such work would be covered under the "Additional Services" provision of the contract and accordingly demanded that his firm be paid on an hourly and not a flat fee basis. Stein said that he would not pay more than $500 for this work and recommended that the parties terminate their relationship. Shaffer agreed, and quickly informed Stein that the amount due plaintiff for services and reimbursable expenses for this project and two others totaled approximately $12,700. Stein stated that such an amount was a lot of money. Shaffer replied that if Stein agreed to pay him $10,000 beyond the $1,000 already paid he would settle the account. Stein agreed to pay that amount within the next 10 days. Shaffer confirmed the settlement in a letter to Stein dated April 15, 1971.

Shaffer made repeated demands for payment during the succeeding months. While acknowledging the debt, Stein made continued requests for delay. Shaffer further testified that by August 20, Stein had sent two checks totaling $5,000. On August 30, Stein told Shaffer that he was ready to proceed with the project on the basis of the existing contract. Stein told Shaffer that he had obtained zoning board approval on July 29 to construct a low-rise multiple-unit dwelling of 34 units. He wanted

Shaffer to abandon the drawings prepared by his firm and to prepare working drawings on the basis of the $15,000 maximum amount figure set out in paragraph II(d) of the contract. Shaffer informed Stein that plaintiff would do the work only if it were paid on the hourly basis set out in the "Additional Services" provision of the contract. Stein refused and angrily walked out, stating that he would pay plaintiff no more money.

On cross-examination, Shaffer testified that only on one occasion, their last meeting, did Stein request his firm to continue with the project. Shaffer then enumerated the type of changes in the drawings that would have been needed to comply with the zoning variation.

Stein testified under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 60) that he commissioned Kantor in March, 1970, to prepare preliminary drawings for only a low-rise, not a high-rise, building. Stein accepted full responsibility for resolving all zoning difficulties. He stated that he never instructed plaintiff to proceed with working drawings prior to August, 1971, for the simple reason that he had not been able to obtain zoning approval for the construction of his building prior to that time. Furthermore, he did not know that plaintiff was preparing such drawings during that time.

Stein was unable to recall the occasion or content of many of the meetings and conversations he had participated in with plaintiff's employees. He also could not remember receiving most of the transmittals and documents sent to him by plaintiff, for he made it a practice to randomly discard mail sent to him by plaintiff without opening it. Stein also denied asking plaintiff to submit permanent drawings at any time. Stein testified that on April 1, 1971, he offered Shaffer $500 to make a revised preliminary drawing to present to the zoning authorities. Shaffer refused, asserting the work was worth more money. Shaffer also refused in August to make drawings on the basis of work done for Stein by another architect. According to Stein, the parties never agreed to terminate their relationship for $10,000.

Defendant presented one witness. Seymour Goldberg, a licensed architect, testified that he ultimately completed the working drawings for Stein that led to the erection of the building. He was paid $6,000 for his work, which took about 6 weeks to complete. According to Goldberg, he had no knowledge of the prior relationship between plaintiff and Stein or of the drawings done by plaintiff.

On cross-examination, Goldberg, after viewing plaintiff's drawings, said that in many respects his work and that of plaintiff were substantially similar. Such similarities are unusual for architects working indepen-

dently on the same project. He recalled that he was "surprised and amazed" at how accurately Stein knew what he wanted. Goldberg was directed to draw the precise design ultimately drafted.

In awarding judgment for plaintiff and in dismissing defendants' counterclaim, the trial court supported its judgment with written findings of fact.

Defendants contend that the trial court's judgment is contrary to the manifest weight of evidence.

■■■ Where the terms of the contract are plain and unambiguous, the instrument itself is the only source of the intention of the parties. (*Decatur Lumber and Manufacturing Co. v. Crail* (1932), 350 Ill. 319, 183 N.E. 228; *Bowler v. Metropolitan Sanitary District* (1969), 117 Ill.App.2d 237, 154 N.E.2d 144.) Where possible, all provisions of the contract are to be construed harmoniously. (*Edward Electric Co. v. Metropolitan Sanitary District* (1973), 16 Ill.App.3d 521, 306 N.E.2d 733.) All phrases and clauses are presumed to have been inserted deliberately and for a purpose. (*Industrial Commodity Corporation v. E. J. Brach & Sons* (1968), 92 Ill.App.2d 163, 235 N.E.2d 857.) Any ambiguity shall be construed most strongly against the person who prepared the contract. (*Watson Lumber Co. v. Guennewig* (1967), 79 Ill.App.2d 377, 226 N.E.2d 270.) In such a case, the intention of the parties can be gleaned from all facts surrounding the formulation of the contract. (*Cedar Park Cemetery Association v. Village of Calumet Park* (1947), 398 Ill. 324, 75 N.E.2d 874.) The construction given the contract by the trial court judge will not be set aside unless contrary to the manifest weight of the evidence. *Spitz v. Brickhouse* (1954), 3 Ill.App.2d 536, 123 N.E.2d 117.

■■ Defendants contend that an examination of paragraph II(d) of the contract evinces the parties' intention that nothing more than $1,000 was to be paid plaintiff absent the latter's preparation and submission to them of a final and completed set of working documents. Since plaintiff admits that the documents were not submitted in such fashion and that it was paid $6,000 by Stein up to the time of trial, defendants maintain that the action for additional money should fail. Defendants' essential argument is that paragraph II(d) sets up a series of conditions precedent tied to the preparation of certain architectural drawings to the earning by plaintiff of its money. An examination of the entire contract, however, lessens whatever attractiveness defendants' position may have when the provision is read in isolation. Paragraph II(a) makes clear that plaintiff's compensation is to be geared to a fixed sum based on an hourly basis, with a maximum fee for basic services set at $15,000. In our judgment, the trial court correctly concluded that paragraph II(d) simply outlines

a mutually convenient method of disbursement by Stein of compensation already earned by plaintiff. It should be noted that paragraph II(d) itself twice characterizes the clause as a "Schedule of Payment."

Even if we accept the argument that the manner in which plaintiff was to earn its compensation was ambiguous under the contract, a study of the conduct of the parties in this case gives clear evidence that they did not intend paragraph II(d) to establish conditions precedent to plaintiff's earning its compensation. Plaintiff regularly sent Stein invoices of the amounts owed, to which Stein never objected as being untimely or excessive. Indeed Stein gave his last two checks to plaintiff without contesting the amount of the demands for payment. The trial court properly found that Stein recognized that plaintiff was operating on an hourly basis for basic services wtih a maximum charge of $15,000.

■■ Moreover, even if we accept defendants' position that the completion of a full set of working documents was a condition precedent to additional remuneration under the contract, the record amply supports the conclusion that defendants' conduct excused plaintiff's full performance of that condition.

Article 6.3 of the contract relates to abandonment or suspension of the contract. That provision states in relevant part as follows:

> "If the Project is suspended for more than three months or abandoned in whole or in part, the Architect shall be paid his compensation for services performed prior to receipt of written notice from the Owner of such suspension or abandonment, together with Reimbursable Expenses then due and all terminal expenses resulting from such suspension or abandonment. &ast; &ast; &ast;"

Article 8 provides that the contract may be terminated upon seven days' written notice "should the other party fail substantially to perform in accordance with its terms through no fault of the other."

Shaffer testified that on March 12, 1971, Stein directed him to cease work on the project. On April 1, Stein came to plaintiff's office and told Shaffer that he wanted plaintiff to prepare modifications of the already completed preliminary drawings to submit to the zoning authorities in an attempt to secure zoning variations. Shaffer refused Stein's offer to pay $500 for the effort, contending that the desired work was encompassed under the "Additional Services" provision of the contract, which mandated compensation to plaintiff on an hourly basis. Stein refused, and proposed that the parties terminate their contract. Shaffer agreed, and informed Stein that the amount owed plaintiff totaled approximately $12,700. After Stein noted that this figure seemed "high," Shaffer offered to settle the account for $10,000. Stein agreed and told Shaffer that plaintiff would be paid within 10 days. However, during the next several

months plaintiff periodically demanded payment and Stein repeatedly acknowledged the debt while requesting delay. Eventually Stein sent Shaffer two checks totaling $5,000.

■■ This testimony strongly supports the legal conclusion that Stein abandoned or cancelled the contract. Although Stein denied Shaffer's account of the events that occurred on and after April 1, the testimony created an issue of credibility to be resolved by the trier of fact. (*Willis v. Ruthrauff & Ryan, Inc.* (1957), 14 Ill.App.2d 259, 144 N.E.2d 636 (abstract opinion).) Plaintiff was entitled to waive its right to have defendants submit the cancellation in writing. (*Cf. Ellman v. Ianni* (1959), 21 Ill.App.2d 353, 157 N.E.2d 807.) In this regard we need not answer defendants' claim that it was plaintiff by its April 1 refusal to modify its drawings which first abandoned the contract. In the first place, we do not believe that plaintiff's oral disagreement with Stein on that occasion rose to the level of a clear breach of contract even if Shaffer incorrectly interpreted the contract. Secondly, even if it constituted a breach, it would not have been a material breach, justifying Stein's subsequent abandonment of the contract and ultimate refusal to pay plaintiff for its substantial services already rendered.

■■ Defendants finally argue that the record does not support the damage award. Yet at trial defendants did not object to the numerous exhibits introduced by plaintiff documenting its hours expended and reimbursable expenses prepaid in connection with its work under the contract. Plaintiff performed as much under the contract as it was permitted to do. The mere fact that at this late stage defendants did not expect as many hours to be put in by plaintiff on the amount of work done is irrelevant. We look to the contract, and that document requires that this award be upheld.

For the reasons stated above, the judgment of the circuit court of Cook County granting judgment to plaintiff in the sum of $6,340.32 and dismissing defendants' counterclaim is affirmed.

Judgment affirmed.

McGLOON, P. J., and MEJDA, J., concur.