CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Plaintiff-Appellee, v. AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY, Defendant-Appellant (Allianz Underwriters Insurance Company *et al.*, Defendants).

First District (6th Division)   No. 1—92—3016

Opinion filed August 26, 1994.—Rehearing denied November 22, 1994.

Lord, Bissell & Brook, of Chicago (Daniel I. Schlessinger, Stephen C. Ascher, Hugh C. Griffin, and Diane I. Jennings, of counsel), Sorling, Northrup, Hanna, Cullen & Cochran, of Springfield, and Anderson, Kill, Olick & Oshinsky, of New York, New York, for appellant.

Kevin M. Forde, Ltd., of Chicago (Lester O. Brown, Stephen R. Kaufmann, and Kevin M. Forde, of counsel), for appellee.

JUSTICE RAKOWSKI delivered the opinion of the court:

This appeal arises from an underlying action in which Central Illinois Public Service Company (CIPS) is seeking a determination that over 100 primary and excess policies issued by 29 different insurers provide coverage for the cost of cleaning up environmental contamination. The contamination occurred at 13 former gas manufacturing plants which CIPS presently or formerly owned and/or operated, including a former plant site at Taylorville, Illinois. Only the Taylorville site is at issue in this appeal, and the sole policy in question is a $15 million environmental impairment liability (EIL) policy issued by American Empire Surplus Lines Insurance Company (American).

On June 12, 1991, the circuit court ruled against American on several issues raised by motions for summary judgment. American then filed this appeal. We have jurisdiction pursuant to Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)). Although there are several issues raised on appeal, we find one to be dispositive, to wit, whether a claim was made against CIPS during the policy period as required under the "claims made policy" absent any demand by a third party. We reverse.

CIPS acquired the Taylorville site in 1912 and continued the manufacturing operations until the early 1930's. During the time that CIPS operated the plant, it was known in the industry that accumulated coal tar and waste water discharged from the tar separators contained toxic substances. Several years after CIPS stopped manufacturing gas, it hired a contractor to dismantle the plant which called for the removal of the aboveground portion of the gas holder. The belowground portion was buried under four feet of debris, but the contractor was not required to remove all of the coal tar residue. No measures were implemented to remove the tar separators or the coal tar residue contained in them. CIPS continued to use the Taylorville plant for the storage of utility poles until 1961, when the plant was sold to a third party.

CIPS purchased the American EIL policy in 1983 for the period of September 1, 1983, to December 1, 1984, and thereafter exercised an option under the policy to purchase an "Extended Discovery Period" which expired on December 1, 1985. The policy provided $15 million coverage in excess of $500,000 retained limit for certain losses CIPS incurred "as a result of claims first made against the insured and reported to the company during the policy period or applicable extended discovery period from an environmental impairment for which the insured is legally liable." The extended discovery period applied only for the purpose of reporting claims arising from an environmental impairment existing or originating during the period when the policy was in full force and effect and otherwise covered under the policy. Specifically, the policy in conjunction with the extended discovery period required that the environmental impairment exist or originate between September 1, 1983, and December 1, 1984, that a claim first be made against CIPS between September 1, 1983, and December 1, 1985, and that the claim be reported to American before December 1, 1985.

In September 1985, CIPS' risk management department reminded corporate officials that, regardless of CIPS' knowledge of potential claims, American's policy would not apply to any environmental claims or suits that CIPS received after December 1, 1985.

On October 20, 1985, the owner of the Taylorville site uncovered a brick tank containing oily material. One week later, after receiving an inquiry as to what this substance might be, CIPS undertook a preliminary investigation of the site. On November 27, 1985, an investigator for the IEPA contacted CIPS to ask for information, but there was no indication that any statutory violation had occurred or that CIPS had an obligation to clean up the site.

Although the Illinois Environmental Protection Agency (IEPA) had not made any claim or demand against it, CIPS reported to a broker in November 1985 that a claim had been made against it involving the Taylorville site. (CIPS' amended complaint alleged that, on or about November 25, 1985, the IEPA had determined and had given informal notice to CIPS that CIPS would be responsible for the clean-up at Taylorville. The circuit court found that this assertion was false and entered sanctions against CIPS.)

Subsequent to the expiration of the extended discovery period, on July 3, 1986, the IEPA issued a notice to CIPS pursuant to section 4(g) of the Environmental Protection Act (Act) (Ill. Rev. Stat. 1985, ch. 111$^{1}/_{2}$, par. 1004(g)) advising CIPS that it might be jointly and severally liable for any costs that the State might incur as a result of any remedial action undertaken at the Taylorville site. The notice further directed CIPS to pursue a three-part project, including locating and removing buried tanks and pipes, determining the extent of contamination, and evaluating remedial alternatives. Pursuant to this notice, CIPS initiated cleanup activities in 1987 which included the removal of buried structures and contaminated soil. On August 21, 1987, CIPS filed this action, seeking a declaration that various insurers, including American, are obligated to indemnify CIPS for costs incurred in the investigation and cleanup of four Illinois sites, including Taylorville. CIPS subsequently amended its complaint to seek recovery from 29 different insurers under more than 100 primary and excess policies. These policies can be divided into two broad categories known as comprehensive general liability (CGL) policies issued by various primary and excess insurers and the EIL policies issued by other insurers including American. The only policy at issue in this appeal is the policy issued by American, which is excess over other valid collectible insurance covering the loss. On June 27, 1989, CIPS moved for partial summary judgment regarding EIL coverage for the Taylorville site, and American filed a cross-motion for summary judgment.

The circuit court issued an order on several motions for summary judgment related to various coverage issues. One of these was the "claims made" issue. According to American's policy, coverage was

limited to claims brought against CIPS and reported to American prior to December 1, 1985. The IEPA claim brought against CIPS was not until July 1986. Nevertheless, the circuit court held that the claim was made against CIPS within the extended discovery period. The court further found that the term "claim" was ambiguous, that it did not require a demand by a third party, and that CIPS reasonably concluded prior to December 1, 1985, that an IEPA claim would be made against it in the future.

American contends that no claim was made against CIPS during the required policy period and that the circuit court's ruling to the contrary was error. American's EIL policy was a "claims made" policy which provided coverage for claims against CIPS prior to December 1, 1985. It is undisputed by the parties that no third-party demand was made against CIPS until the one by the IEPA in July 1986. The circuit court found that the term "claim" was ambiguous because it was not defined in the provisions of the policy. As a result, the court ruled that although no claim had been asserted against CIPS by the IEPA, prior to December 1, 1985, the "claims made" provision of the policy had been satisfied because CIPS "reasonably concluded" prior to December 1, 1985, that a future IEPA claim was inevitable.

However, the court in *Evanston Insurance Co. v. Security Assurance Co.* (N.D. Ill. 1989), 715 F. Supp. 1405, 1412, quoting *National Union Fire Insurance Co. v. Continental Illinois Corp.* (N.D. Ill. 1987), 673 F. Supp. 300, 306, referring to the absence of a definition of the term "claim" in a policy, stated:

> "Clearly the policy uses the term 'in its common (and common sense) usage: an effort by a third party to recover money from the insured' [citation]. That usage conforms to the garden-variety dictionary definition of 'claim' (Black's Law Dictionary 224 (5th ed. 1979)):
> Demand for money or property, e.g. insurance claim."

According to Webster's Fifth New Collegiate Dictionary 205, the term "claim" means "a demand for something due or believed to be due." The word has no different usage in the insurance industry. (See *Insurance Corp. of America v. Dillon, Hardamon & Cohen* (N.D. Ind. 1988), 725 F. Supp. 1461, 1468; *Bensalem Township v. Western World Insurance Co.* (E.D. Pa. 1985), 609 F. Supp. 1343, 1348.) In *Hoyt v. St. Paul Fire & Marine Insurance Co.* (9th Cir. 1979), 607 F.2d 864, 866, the court found that a claims made provision in the policy mandated the conclusion that a claim must be a third-party demand. In *Jensen v. Snellings* (5th Cir. 1988), 841 F.2d 600, 616, the court also concluded that the term "claim" in a policy was in the nature of an actual demand for something.

██ An agreement reduced to writing must be presumed to reflect the intention of the parties who signed it. (*Western Illinois Oil Co. v. Thompson* (1962), 26 Ill. 2d 287, 291, 186 N.E.2d 285.) Where the terms of an agreement are plain and unambiguous, the intent of the parties must be determined solely from the words within the agreement. (*Maloney v. Maloney* (1980), 88 Ill. App. 3d 146, 148, 410 N.E.2d 416; *Herbert Shaffer Associates, Inc. v. First Bank* (1975), 30 Ill. App. 3d 647, 653, 332 N.E.2d 703.) In addition, the absence of a definition does not render a policy term ambiguous, nor is it ambiguous simply because there is a disagreement as to the meaning of the term. The alternate interpretation must also be reasonable. (*Bruder v. Country Mutual Insurance Co.* (1993), 156 Ill. 2d 179, 193, 620 N.E.2d 355; *Milwaukee Guardian Insurance, Inc. v. Taraska* (1992), 236 Ill. App. 3d 973, 974, 602 N.E.2d 70; *Katz v. American Family Insurance Co.* (1987), 163 Ill. App. 3d 549, 552, 516 N.E.2d 795.) Whether an ambiguity exists is a question of law for the court to determine. *Country Service & Supply Co. v. Harris Trust & Savings Bank* (1981), 103 Ill. App. 3d 161, 165, 430 N.E.2d 631.

The EIL policy provision at issue states that American will indemnify CIPS for losses incurred as a result of *claims first made against the insured* during the policy period and reported to American during the policy period or extended discovery period. Thus, in the context of the whole policy the only reasonable interpretation is that a claim against CIPS is a demand by a third party that CIPS do something.

██ The trial court concluded that "the undefined presence of the word 'claim' in this environmental impairment setting makes the word ambiguous." Applying this reasoning, CIPS attempts to distinguish the cases cited by American on the basis that they are not environmental cases. However, we fail to understand, and CIPS has presented no argument or authority, why the definition of a claim should vary depending upon the perils insured. Accordingly, we judge the distinction to be one without a difference. We also note that to read out of the policy the requirement of a third-party demand would effectively convert a claims made policy into an occurrence policy whereby the insured, after reasonably concluding that a claim would inevitably be brought, could simply give notice to its "claims made insurer" that it was treating the future demands as claims.

The major difference between a claims made and an occurrence policy lies in the risk insured. In an occurrence policy, the risk is the occurrence itself, whereas in the claims made policy the risk insured is the claim brought by a third party. (*Insurance Corp. of America,* 725 F. Supp. at 1469. See also *Stiefel v. Illinois Union Insurance Co.*

(1983), 116 Ill. App. 3d 352, 452 N.E.2d 73.) In *Stine v. Continental Casualty Co.* (1984), 419 Mich. 89, 349 N.W.2d 127, the Michigan Supreme Court noted that parties to a claims made insurance policy base their agreement on the premise that a claim is an easily identifiable risk that will allow the insurer to know the extent of its exposure in terms of the number of claims made. (*Stine,* 419 Mich. at 99-100, 349 N.W.2d at 131.) The court further stated that "the provision of the insuring agreement which is critical to establishing liability in such policies is the time at which the injured third person's claim is made against the insured." (*Stine,* 419 Mich. at 105, 349 N.W.2d at 134.) In *Pacific Employers Insurance Co. v. Superior Court* (1990), 221 Cal. App. 3d 1348, 1359-60, 270 Cal. Rptr. 779, 785, the court addressed the advantages of claims made policies:

> "The social utility of claims made policies has been well documented. Underwriters, secure in the fact that claims will not arise under the subject policy after its expiration or termination can underwrite a risk and compute premiums with greater certainty. An insurance company can establish its reserves without having to consider the possibilities of inflation beyond the policy period, upward-spiralling jury awards, or later changes in the definition and application of negligence. [Citations.] There are benefits to the insured as well. Among other things, 'claims made' policies aid in making insurance more available and less expensive than occurrence policies."

In the case *sub judice,* because CIPS agreed to and paid for a claims made policy, it is bound by the unambiguous language contained therein. It is undisputed that no claim was made by a third party against CIPS until the IEPA asserted its claim in July 1986, which was subsequent to the expiration of the policy and extended discovery period.

Accordingly, the order of the circuit court is reversed and summary judgment is entered on American's motion.

Reversed.

EGAN, P.J., and McNAMARA, J., concur.