Joseph Carr DAVIS, et al., Plaintiffs,

v.

McDONALD'S CORPORATION,
a Delaware corporation,
Defendant.

McDonald's Corporation, a Delaware
corporation, Plaintiff,

v.

Joseph Carr Davis, et al., Defendants.

Nos. 3:96cv494/LAC, 3:97cv23/LAC.

United States District Court,
N.D. Florida,
Pensacola Division.

March 30, 1998.

Chris Cadenhead, Crestview, FL, Omar Arcia, Miami, FL, for plaintiffs.

David McGee, Pensacola, FL, Robert King, Alan Silberman, Chicago, IL, for defendants.

### PARTIAL SUMMARY JUDGMENT

COLLIER, District Judge.

Before the Court are the motions for summary judgment filed by McDonald's Corporation in the above-styled actions. (doc. 49, 57). Joseph Davis and J.C. Davis Foods, Inc. (hereinafter collectively referred to as "Davis") have responded. (doc. 69). For the reasons stated below, McDonald's motions will be granted in part.

### I. Standard of Review

A motion for summary judgment can be granted only when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). An issue of fact is "genuine" if the record as a whole could lead a rational trier of fact to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it might affect the outcome of the case under the governing law. Id. In ruling on a motion for summary judgment, this Court must view the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir.1997). However, the Court is not required to deny summary judgment when the evidence favoring the nonmoving party is merely colorable or is not significantly probative. Id.

### II. Background

For purposes of these motions, the Court accepts the following facts as undisputed. McDonald's owns, develops, franchises, and operates a restaurant "system" in which its intellectual property and other property assets are used to create a network of McDonald's restaurants. McDonald's selects locations to be developed as restaurants, buys or leases the real property, and invests substantial amounts of its own capital in constructing and developing the restaurant buildings. Thereafter, the restaurants are operated either by McDonald's or selected individual franchisees.

In or around May of 1991, Plaintiff Joseph Davis bought the following five McDonald's franchises in Pensacola, Florida: (1) 2120 Fairfield Dr.; (2) 7198 Pensacola Blvd.; (3) 6003 Mobile Hwy.; (4) 7915 Davis Hwy.; and (5) 123 Nine Mile Rd. All of the foregoing restaurants were previously operated by McDonald's. Davis later assigned the Mobile Hwy. franchise to J.C. Davis Foods, Inc., a corporation wholly owned by Davis.

Prior to buying the Pensacola franchises, Davis visited the Pensacola area and spoke with McDonald's representatives. Davis met with Terri Flag, an internal accountant for McDonald's, regarding the prices of various existing restaurants in Pensacola. Flag showed Davis several, one-page, computer generated "restaurant pricing analyses" for different stores. Each analysis contained a projection of future sales based on historical data for a particular store and based on certain assumptions. One contingency not accounted for by the analyses was loss of sales from competition with other McDonald's restaurants which might be developed in the future. Printed at the bottom of each analysis were the following words: "RECIPIENT SHOULD NOT EXPECT TO ACHIEVE ANY OF THE REVENUES OR EXPENSES IN THE ATTACHED."

Before purchasing the Pensacola franchises, Davis also spoke with Jack Suther-

land, the McDonald's regional manager responsible for Pensacola, about McDonald's future plans to expand in the Pensacola area. Sutherland told Davis that the only restaurant "on the board"[1] was the one located at 815 E. Cervantes St., which was sufficiently far from Davis' restaurants that it would not have a significant impact on his sales. The Cervantes restaurant, which opened in 1990, was the first store to be built in Pensacola in six years. At the time he entered the Pensacola franchise agreements, Davis had no idea whether McDonald's would build other future restaurants in the Pensacola area, and he made no efforts to determine whether McDonald's had been looking at other potential locations for restaurants. Nonetheless, Davis believed McDonald's expansion in the Pensacola area would be minimal. Davis relied on the following: the fact that after several years of no expansion, McDonald's was building only one restaurant in Pensacola, located at Cervantes; the sales projections contained in the price analyses which did not account for future expansion; and McDonald's failure to inform him of its intent to expand.

Prior to executing the franchise agreements, Davis received McDonald's "Uniform Franchise Offering Circular" ("UFOC"), which stated in pertinent part:

McDonald's franchises contain a limited grant of authority to use the 'McDonald's System' in the operation of the specific restaurant developed by McDonald's at that address. The franchise does not contain any exclusive grant, exclusive area, exclusive territorial rights, protected territory, nor any right to exclude, control or impose conditions on the location or development of future McDonald's restaurants at any time.

For each of the five Pensacola restaurants, Davis entered into a separate franchise agreement consisting of a Franchise Letter Agreement with an attached License Agreement and Lease Agreement. The franchise agreements granted Davis the right to use the McDonald's System, including its associated trademarks and service marks, in the operation of his restaurants. Paragraph 2(a) of each License Agreement provides:

Licensor grants to Licensee for following stated term the right ... (i) to adopt and use the McDonald's System in the Restaurant constructed or to be constructed at [a specific street address] and at that location only.

Among the payments Davis was required to make in exchange for the licenses were service fees and percentage rent based on a percentage of his gross sales.

In paragraph 28 of each License Agreement, Davis acknowledged:

(c) No representation has been made by Licensor as to the future profitability of the Restaurant;

(d) Prior to the execution of this License, Licensee has worked at a McDonald's restaurant, has had ample opportunity to contact existing licensees of Licensor and to investigate all representations made by Licensor relating to the McDonald's System;

(e) That this license establishes a Restaurant at the location specified ... and that no 'exclusive,' 'protected' or other territorial rights in the contiguous market area of such Restaurant is hereby granted or inferred;

(f) This License supersedes any and all other agreements, representations, respecting the Restaurant and contains all the terms, conditions, and obligations of the parties with respect to the grant of this License.

Davis also acknowledged in every Franchise Letter Agreement that:

---

1. Although Davis used the phrase, "on the board," in his deposition and in his affidavit, it is unclear what he meant by that. Davis also stated, "[t]hey told me the only store that was

on the plan that they were building was Cervantes, and that was under construction and getting ready to open." (Davis depo., p. 120).

[i]t is understood and agreed that neither McDonald's nor anyone acting on behalf of McDonald's has made any representations, inducements, promises, or agreements, orally or otherwise, respecting the subject matter of the Franchise which is not embodied herein or set forth in the Uniform Franchise Offering Circular for Prospective Franchisees. You hereby agree that the terms of the Franchise shall not be modified or amended in any way, except by a written document which is executed by you and McDonald's and which is specifically identified as an amendment hereto.

Paragraph 20(d) of each License Agreement states that "[u]pon termination or expiration of the License, Licensee shall ... discontinue the use of the McDonald's System and its associated trade names, service marks and trademarks or the use of any and all signs and printed goods bearing such names and marks, or any reference to them ...." The Franchise Letter Agreements, which expressly incorporate the License and Lease Agreements, provide that:

[a]ny act or failure to act which constitutes a breach of or default of the obligations, conditions, terms and covenants of said agreements, shall constitute a breach of this entire Franchise Letter Agreement. Notice thereof shall constitute notice of a breach of this entire Franchise letter Agreement, and any resulting termination shall terminate the Franchise in its entirety.

Following Davis' purchase of the Pensacola franchises, McDonald's developed four new restaurants in the Pensacola area. These new restaurants were opened between 1994 and 1996 and were at least four miles away from each of Davis' restaurants. Sales at Davis' restaurants were negatively impacted by the opening of these additional restaurants, and at one restaurant Davis experienced as much as a 45% decline in sales. In the franchise business, such impact is commonly referred to as encroachment.

Davis had prior experience as a McDonald's franchisee before entering the Pensacola market. From 1980 until 1991, Davis operated multiple franchises in Arkansas, first in Russellville and later in Little Rock. Davis suffered financial difficulties in Little Rock when McDonald's expansion in that market reduced his sales. Davis hoped to improve his financial problems by purchasing the McDonald's franchises in Pensacola. Before Davis could purchase the Pensacola franchises, however, McDonald's required him to sell his Little Rock franchises. Davis was not allowed to maximize the selling price of the Little Rock restaurants due to the terms McDonald's imposed on the sale.[2]

The negative impact on Davis' sales from the opening of new McDonald's restaurants in the Pensacola area then exacerbated Davis' already poor financial position.[3] Consequently, in August of 1996, Davis ceased paying McDonald's the percentage rent and service fees due under the franchise agreements. In January of 1997, McDonald's confirmed the termination of Davis' franchise agreements for non-payment. Despite his inability to pay the required fees under the franchise agreements and McDonald's termination of his franchises, Davis continued to operate the Pensacola restaurants until July of 1997, when the parties entered an agreed order in this case under which Davis surrendered the properties to McDonald's.

On October 15, 1996, Davis filed a complaint with this Court against McDonald's (Case No. 3:96cv494) based on the opening

---

**2.** In this action, Davis does not seek damages for the harm he allegedly suffered as a result of the parties' dealings in Arkansas.

**3.** Interestingly, Davis testified in his deposition that without the debt that carried over from Little Rock, he did not think he would have had cash flow problems in 1995–1997, indicating that the Pensacola restaurants must have remained profitable despite McDonald's expansion.

of additional restaurants in the Pensacola area which encroached on Davis' sales. The amended complaint (doc. 23), filed on January 7, 1997, contains the following eight counts: (1) breach of contract; (2) breach of implied covenant of good faith and fair dealing; (3) common law fraud and misrepresentation; (4) negligent misrepresentation; (5) violation of the Florida Franchise Act, § 817.416(2)(a), *Florida Statutes;* (6) promissory estoppel; (7) equitable estoppel; and (8) recission.[4] On January 17, 1997, McDonald's filed a complaint against Davis (Case No. 3:97cv23) alleging claims for: (1) injunctive relief and specific performance; (2) common law and federal trademark infringement; and (3) payment of unpaid debt. On March 10, 1997, this Court entered an order granting Davis' motion to consolidate Case No. 3:97cv23 and Case No. 3:96cv494 for all purposes. (doc. 32).

### III. McDonald's motion for summary judgment in Case No. 3:96cv494

#### A. Breach of contract and the covenant of good faith and fair dealing

Davis' claims for breach of contract and breach of covenant of good faith and fair dealing are based on the franchise agreements for his Pensacola restaurants. Davis concedes that the franchise agreements did not grant him an exclusive territory, but he claims that he nonetheless had a commercially reasonable expectation that McDonald's would not act to substantially impact sales at his restaurants through the development of new stores.

In its motion, McDonald's argues that the parties' franchise agreements expressly denied Davis any protection from encroachment and that Davis' claims therefore fail. In his response, Davis contends that paragraph 28(e) of the License Agreements, which states that "no 'exclusive,' 'protected' or other territorial rights in the

contiguous market area of such Restaurant is hereby granted or inferred," does not apply to the area immediately contiguous to the actual restaurant. Rather, Davis submits that there is some area surrounding a restaurant which is protected from encroachment, and it is only the territory contiguous to that protected area which is addressed by paragraph 28(e).

According to Davis, his interpretation is reasonable and is supported by McDonald's view that it would be precluded from building another restaurant right next door to one of Davis' restaurants. Davis contends that his interpretation is also supported by a written McDonald's policy entitled "The Market Share/Impact Framework" (hereinafter "Impact Framework"). Rather than prohibiting encroachment, the Impact Framework establishes a procedure by which franchisees, whose sales are sufficiently impacted by the development of new restaurants, may seek economic assistance from McDonald's. Davis claims the Impact Framework was incorporated into the License Agreement, or alternatively, that it supplements the terms of the contract as evidence of McDonald's course of dealing.[5] The Court cannot agree with Davis' assessment.

Illinois law governs the parties' contracts. Under the law of that state, "the primary objective of contract construction is to give effect to the intention of the parties." *Harrison v. Sears, Roebuck & Co.,* 189 Ill.App.3d 980, 137 Ill.Dec. 494, 546 N.E.2d 248, 253 (1989). Illinois common law also provides that "where the terms of the contract are plain and unambiguous, the instrument itself is the only source of the intention of the parties." *Herbert Shaffer Assoc., Inc. v. First Bank of Oak Park,* 30 Ill.App.3d 647, 332 N.E.2d 703, 708 (1975). However, Davis appears to contend that the Uniform Commercial

---

4. Davis has since waived his claim for recission. (doc. 69, n. 1).

5. There is some evidence McDonald's failed to comply with the procedures set forth in the Impact Framework.

Code adopted by Illinois, not common law, applies to the parties' contracts. Under the UCC, final written expressions of the parties' agreement may be explained or supplemented:

> (a) by course of dealing or usage of trade (Section 1–205) or by course of performance (Section 2–208); and

> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

810 Ill. Comp. Stat. Ann. 5/2–202.[6]

As a preliminary matter, the Court will consider Davis' argument that the Impact Framework was incorporated into the parties' franchise agreements. According to Davis, the Impact Framework was incorporated into the License Agreements by language requiring the franchisee's compliance with the "McDonald's System," which System includes:

> proprietary rights in certain valuable trade names, service marks and trademarks, including the trade names, 'McDonald's' and 'McDonald's Hamburgers,' designs and color schemes for restaurant buildings, signs, equipment layouts, formulas and specifications for certain food products, methods of inventory and operation control, bookkeeping and accounting, and *manuals covering business practices and policies.*

Davis also contends that the Impact Framework was incorporated into the License Agreements by the following provisions:

> 3. *General Services of Licensor,* Licensor shall advise and consult with Licensee periodically in connection with the operation of the Restaurant and also, upon Licensee's request, at other reasonable times. Licensor shall communicate to Licensee its know-how, new developments, techniques and improvements in areas of restaurant manage-

ment, food preparation, and service which are pertinent to the operation of a restaurant using the McDonald's System.... *Licensor shall also make available to Licensee all additional services, facilities, rights and privileges which Licensor makes generally available, from time to time, to all its licensees operating McDonald's Restaurants.*

> 4. *Manuals.* Licensor shall provide Licensee with the business manuals prepared by McDonald's for use by licensees of McDonald's restaurants similar to the Restaurant to be operated by Licensee. The business manuals contain detailed information relating to operation of the Restaurant including (a) food formulas and specifications for designated food and beverage products; (b) methods of inventory control; (c) bookkeeping and accounting procedures; (d) business practices and policies; and (e) other management, advertising, and personnel policies. Licensee agrees to promptly adopt and use exclusively the formulas, methods and policies contained in the business manuals, now and as they may be modified by Licensor from time to time. Licensee acknowledges that McDonald's is the owner of all proprietary rights in and to the McDonald's System and that the information revealed in the business manuals, in their entirety, constitute confidential trade secrets.... *Such manuals, as modified by Licensor from time to time, and the policies contained therein, are incorporated in this License by reference.*

(Emphasis added).

 To incorporate another document by reference, "the contract must show an intent to incorporate that other document and make it a part of the contract." *Payne v. McDonald's Corp.*, 957 F.Supp. 749, 756 (D.Md.1997) (citing *Harrison,* 137 Ill.Dec. 494, 546 N.E.2d at 253). Reading the foregoing provisions of the License Agreement in their entirety, it is clear that

---

**6.** Because its application will not change the outcome of this case, this Court will assume without deciding that the UCC applies to the franchise agreements.

such language does not demonstrate an intent to incorporate the Impact Framework. Those paragraphs pertain only to the internal operations of the restaurants, not to any policies regarding competition from other restaurants. *See id.* at 756–57; *Talamantez v. McDonald's Corp.*, Civ. 97–0734 PHX ROS (D.Ariz. Dec. 31, 1997); *Chang v. McDonald's Corp.*, Bus. Franchise Guide (CCH) ¶ 10,677, at 26,728 (N.D.Cal.1995), *aff'd*, No. 95–16012, 1996 WL 742455, at *1 (9th Cir. Dec.19, 1996). A review of the Impact Framework does not lead this Court to a different conclusion. Accordingly, there is no issue of fact as to whether the Impact Framework was incorporated into the parties' franchise agreements.

Additionally, the Court finds that the franchise agreements constitute the complete and exclusive expressions of the parties' contracts with respect to the franchises. Paragraph 28(f) of the License Agreements states that "the License supersedes any and all other agreements, representations, respecting the Restaurant and contains all the terms, conditions, and obligations of the parties with respect to the grant of this License." Davis further acknowledged in the Franchise Letter Agreements that:

> [i]t is understood and agreed that neither McDonald's nor anyone acting on behalf of McDonald's has made any representations, inducements, promises, or agreements, orally or otherwise, respecting the subject matter of the Franchise which is not embodied herein or set forth in the Uniform Franchise Offering Circular for Prospective Franchisees. You hereby agree that the terms of the Franchise shall not be modified or amended in any way, except by a writ-

ten document which is executed by you and McDonald's and which is specifically identified as an amendment hereto.[7]

Moreover, Davis has not produced any evidence, including the Impact Framework,[8] which would suggest that the parties did not intend for the franchise agreements to be the complete and exclusive expressions of the contracts. Thus, Plaintiff may not rely on the Impact Framework as evidence of "consistent additional terms" under the UCC. *See* 810 Ill. Comp. Stat. Ann. 5/2–202(b). Without evidence of the frequency with which McDonald's applied the Impact Framework directly to the parties' relationship or to McDonald's dealings with other franchisees, which is absent in this case, Plaintiff is similarly precluded from invoking the Impact Framework as evidence of course of dealing, trade usage, or course of performance, as those terms are defined by the UCC. *See* 810 Ill. Comp. Stat. Ann. 5/2–205–208.,

The Court therefore turns to the language of the franchise agreements to discern the intent of the parties. Paragraph 2(a) of the License Agreements indicate that each license is specific to a restaurant occupying a particular street address. Contrary to Davis' allegations, a plain reading of the License Agreements reveals that it is the market area contiguous to the restaurant's street address in which Davis has "no 'exclusive,' 'protected' or other territorial rights." The UFOC, which Davis acknowledged receiving in the License Agreements, is consistent with this interpretation. That document states that "the franchise does not contain any exclusive grant, exclusive area, exclusive territorial rights, protected territory, *nor any right to exclude, control or impose conditions on the location or devel-*

---

7. It is undisputed that the Impact Framework did not meet the requirements for a modification to the parties' contracts.

8. The copy of the Impact Framework which was submitted by Davis is dated August, 1996 and contains only a 1996 copyright. It also states that "[m]anagement extended the Mar-

ket Share/Impact Framework eligibility to a national basis for new store openings effective 1/1/94." Because McDonald's as the moving party has not produced evidence that the Impact Framework did not apply in Davis' region when the franchise agreements were entered, this Court will assume that it did.

*opment of future McDonald's restaurants at any time."* (Emphasis added). These terms are unambiguous and did not grant Davis any right of protection from substantial impact on his sales by the development of the new restaurants in the Pensacola area. Accordingly, Davis' claim for breach of the express provisions of the contracts must fail.

Whether McDonald's concedes a limitation on developing new restaurants next to existing franchises is of no importance to this conclusion. This Court can imagine a situation where a franchisor's development of a restaurant next door to an existing franchise might so completely frustrate the purpose of the franchise agreement and deprive the existing franchisee of the fruits of the agreement that an action for breach of contract would exist. That, however, is not the situation confronting this Court. Without alleging how profitable his franchises remained after the development of additional restaurants in the Pensacola area, Davis merely contends that his sales were significantly impacted.[9]

■ Davis also claims that McDonald's breached the covenant of good faith and fair dealing which was implied in the parties' contracts. Under Illinois law, the covenant of good faith and fair dealing is implied in every contract. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir.1992); *Resolution Trust Corp. v. Holtzman*, 248 Ill.App.3d 105, 187 Ill.Dec. 827, 618 N.E.2d 418, 424 (1993). However, as the court in *Beraha* stated, "the covenant of good faith and fair dealing has never been an independent source of duties for the parties to a contract. A lack of good faith does not by itself create a cause of action .... Instead, the covenant guides the construction of explicit terms in an agreement." 956 F.2d at 1443. Thus, the implied covenant will not "overrule or

modify the express contract of the parties." *Holtzman*, 187 Ill.Dec. 827, 618 N.E.2d at 424. The covenant generally finds application in cases where one party is vested with broad contractual discretion and requires that party "to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Id.*

■ In the instant case, there is no express contractual provision that required McDonald's to respect Davis' customer base or market area through the use of discretion when it chose where and when to develop new restaurants. To the contrary, the express terms of the contract unambiguously denied Davis any protected market area, and any expectation by Davis of such protection was therefore unreasonable. This Court will not apply the covenant of good faith and fair dealing to impose a condition on McDonald's which contradicts the express terms of the contracts. Accordingly, Plaintiff has no cause of action for breach of the implied covenant of good faith and fair dealing. *See Payne*, 957 F.Supp. at 758; *Chang*, 1996 WL 742455, at *2.

Summary judgment will therefore be entered in favor of McDonald's on counts I and II.

### B. Common law fraud and misrepresentation, negligent misrepresentation, promissory estoppel, and equitable estoppel

Davis' claims of fraud and misrepresentation, negligent misrepresentation, promissory estoppel, and equitable estoppel are all founded on the allegation that, to his detriment, he justifiably relied on McDonald's misrepresentations about the profitability of his franchises and McDonald's plans to expand in the Pensacola

---

9. As a practical matter, this Court has difficulty foreseeing a situation where a franchisor might develop a new store next to an existing franchise. The franchisor has every interest in maintaining sufficient distance be-

tween stores so as to sustain a healthy level of profits at all locations and thereby render the locations suitable for the franchisor's own operation or capable of attracting franchisees.

area. Based on the language of the amended complaint, Davis appears to allege claims for misrepresentations which occurred before and after the formation of the franchise agreements. The alleged misrepresentations included statements that his Pensacola franchises were capable of generating $6,632,881 in combined annual gross sales; representations regarding the impact of new restaurants on Davis' franchises; and McDonald's failure to disclose to Davis that its expansion plans would substantially impact Davis' restaurants. In reliance on these alleged misrepresentations, Davis claims he: entered the Pensacola franchise agreements; continued spending substantial sums of time, money and effort in developing the market for McDonald's products, its trade names and trademarks and the McDonald's System; continued reinvesting substantial sums of money into the restaurant facilities; continued operating the restaurants at maximum efficiency; and refrained from pursuing other business opportunities.

██ The parties agree that Florida law governs these counts and that reasonable reliance on the alleged misrepresentations is a necessary element to each of these claims. The only alleged misrepresentations preceding the formation of the franchise agreements and specifically discussed by the parties are the price analyses shown to Davis by Terri Flag, Jack Sutherland's statement to Davis that the only restaurant "on the board" was the one located at Cervantes St. and McDonald's failure to disclose its expansion plans. With respect to these pre-formation statements and omissions, the Court agrees with McDonald's that Davis could not have reasonably relied on them as representations about the profitability of Davis' franchises and McDonald's expansion plans.

Printed at the bottom of each price analysis were the following words: "RECIPIENT SHOULD NOT EXPECT TO ACHIEVE ANY OF THE REVENUES OR EXPENSES IN THE ATTACHED." Davis does not claim that Terri Flag or anyone else told him that the price analyses accounted for McDonald's future expansion plans in the Pensacola area. Davis also testified that he had no idea whether McDonald's would build other future restaurants in the Pensacola area, and that he made no efforts to determine whether McDonald's had been looking at other potential locations for restaurants. The Court notes that Davis was no stranger to the possibility of encroachment, having suffered its consequences in Arkansas.

Furthermore, in paragraph 28 of each License Agreement, Davis acknowledged:

(c) No representation has been made by Licensor as to the future profitability of the Restaurant;

(d) Prior to the execution of this License, Licensee has worked at a McDonald's restaurant, has had ample opportunity to contact existing licensees of Licensor and to investigate all representations made by Licensor relating to the McDonald's System;

. . . .

(f) This License supersedes any and all other agreements, representations, respecting the Restaurant and contains all the terms, conditions, and obligations of the parties with respect to the grant of this License.

Davis also acknowledged in every Franchise Letter Agreement that:

[i]t is understood and agreed that neither McDonald's nor anyone acting on behalf of McDonald's has made any representations, inducements, promises, or agreements, orally or otherwise, respecting the subject matter of the Franchise which is not embodied herein or set forth in the Uniform Franchise Offering Circular for Prospective Franchisees.

Finally, as this Court has already found, Davis had no right to a protected or exclusive market area such that he could reasonably expect McDonald's to disclose any

plans to develop new restaurants or to refrain from depleting his profits through encroachment.

Accordingly, Davis' claims for fraud and misrepresentation, negligent misrepresentation, promissory estoppel, and equitable estoppel fail insofar as they are based on McDonald's failure to disclose and the alleged pre-formation misrepresentations from Terri Flag and Jack Sutherland. *See Barnes v. Burger King Corp.*, 932 F.Supp. 1420, 1427–29, 1440 (S.D.Fla.1996); *Hall v. Burger King Corp.*, 912 F.Supp. 1509, 1529 (S.D.Fla.1995). Summary judgment will be granted in favor of McDonald's on said claims in counts III, IV, VI, and VII.

 As for alleged misrepresentations occurring after the execution of the franchise agreements, this Court finds that issues of fact remain for trial. In the amended complaint, Davis appears to at least allege that McDonald's misrepresented the impact new stores would have on sales at his franchises. McDonald's has produced no evidence that such misrepresentations did not occur. Instead, McDonald's erroneously contends that Davis fails to state a claim because he only alleges misrepresentations regarding future occurrences, not existing facts, and because the claims rely on the false assumption that he had some protected market area.

 Initially, the alleged post-formation misrepresentations may be actionable under Florida law despite the fact that they concern future impact and profitability, as long as McDonald's possessed superior knowledge of the underlying facts. *See Burger King Corp. v. Austin,* 805 F.Supp. 1007, 1024 (S.D.Fla.1992). McDonald's has not convinced this Court that there is undisputed evidence showing Davis and McDonald's had equal knowledge of the facts underlying the alleged misrepresentations. As well, Davis' right to rely on such misrepresentations is not necessarily diminished by the fact that he had no right to a protected market area under the franchise agreements. Granting that Davis had no right to any protection from encroachment, he may nonetheless have reasonably relied on misrepresentations about future impact when deciding to continue investing in his own restaurants and/or to refrain from pursuing other business opportunities.[10] Awarding Davis damages for his detrimental reliance on such misrepresentations would not be an acknowledgment of a protected market area, but would merely provide a remedy for McDonald's allegedly tortious conduct.

Thus, summary judgment will be denied with respect to Davis' claims in counts III, IV, VI, and VII insofar as they are based on the alleged post-formation misrepresentations.

### C. Violation of the Florida Franchise Act

The Florida Franchise Act provides in relevant part:

**(2) Declarations.—**

(a) It is unlawful, when selling or establishing a franchise or distributorship, for any person:

1. Intentionally to misrepresent the prospects or chances for success of a proposed or existing franchise or distributorship;

. . . .

3. Intentionally to misrepresent or fail to disclose efforts to sell or establish more franchises or distributorships than is reasonable to expect the market or market area for the particular franchise or distributorship to sustain.

Fla. Stat. § 817.416(2)(a). This count fails to state a claim because Illinois law, not Florida law, governs the parties' franchise agreements. *See Loehr v. Hot 'N Now,*

---

10. The Court recognizes that Davis did not have much flexibility under the franchise agreements in making such decisions. It appears, however, that some options would have been available to Davis, including the possibility of assigning his franchises to someone else.

*Inc.,* Case No. 95–6253–CIV (S.D.Fla. Feb.11, 1998); *Burger King v. Austin,* 805 F.Supp. at 1023. Summary judgment will therefore be granted in favor of McDonald's on count V.

### D. Recission

In accordance with Davis' waiver of this claim, summary judgment will be granted in McDonald's favor on count VIII.

### IV. McDonald's motion for summary judgment in Case No. 3:97cv23

As previously stated, McDonald's sues Davis in this action for specific performance and injunctive relief, trademark infringement, and payment of an unpaid debt based on Davis' refusal to make required payments to McDonald's after August of 1996 and his continued operation of the restaurants after McDonald's terminated the franchises on January 14, 1997. In this motion, McDonald's argues that Davis' failure to make payments required by the franchise agreements after August of 1996 constituted a breach of the franchise agreements for which McDonald's properly terminated the franchises. In response, Davis merely contends that he was relieved of his obligations to make payments under the franchise agreements by McDonald's antecedent breach of the agreements, and that McDonald's termination of his franchises in January of 1997 was therefore improper. Davis' defenses are based on the identical arguments made in support of his claims for breach of contract and breach of the covenant of good faith and fair dealing in Case No. 3:96cv494.

The undisputed evidence shows that Davis breached the franchise agreements in August of 1996 when he ceased making the payments required by those contracts and that he continued to breach the franchise agreements thereafter by operating the restaurants without paying McDonald's. Moreover, pursuant to the express terms of the contracts, McDonald's served Davis with a notice of termination on January 14, 1997, resulting in a complete termination of the franchises. Because this Court granted summary judgment in favor of McDonald's on Davis' claims for breach of contract and breach of the covenant of good faith and fair dealing, Davis may not rely on those claims as defenses in this case. For this and other reasons, summary judgment will be granted in part for McDonald's.

In count I, McDonald's seeks an injunction against Davis requiring Davis to vacate his restaurants, to refrain from removing McDonald's property therefrom, to return McDonald's proprietary information, and to discontinue using and refrain from disclosing any portion of the McDonald's System. McDonald's submits that Davis has confessed judgment with respect to this count by virtue of his consent to the agreed order entered by this Court on July 17, 1997, whereby Davis agreed to surrender the restaurants and other McDonald's property. (doc. 42). It is in light of the agreed order, however, that the Court concludes it is inappropriate to enter the requested injunction. At this stage, such an injunction would appear to serve no purpose. Instead, the Court will *sua sponte* dismiss this count without prejudice as moot.

With respect to count II, it is undisputed that after January 14, 1997, Davis used McDonald's valid trademarks and service marks in the operation of his restaurants without authorization until he vacated the restaurants pursuant to the agreed order. Such use was likely to lead to confusion regarding Davis' association with McDonald's, and Davis therefore engaged in intentional trademark and service mark infringement under 15 U.S.C. § 1114. *See Burger King Corp. v. Hall,* 770 F.Supp. 633, 638 (S.D.Fla.1991) ("Hall's status as a 'holdover' franchisee alone is dispositive of the infringement issue.").[11] Under 15 U.S.C. § 1117(a), Mc-

11. The court in *Hall* also recognized the

widely held principle that "a terminated fran-

Donald's requests damages at least in the amount of the fees Davis would have owed McDonald's for operating the restaurants from January 14, 1997 to July 16, 1997. There is undisputed evidence that this amount is $302,211.52.

 Section 1117(a) provides that when a court assesses damages in a case of trademark or service mark infringement, "the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." That section also permits a court to award reasonable attorneys' fees to the prevailing party in exceptional cases. Although the damages requested by McDonald's include the unpaid fees Davis would have owed under the franchise agreements for operating the restaurants, it is impossible to know the full extent of damages suffered by McDonald's as a result of Davis' infringement. Thus, pursuant to § 1117(a), this Court determines that judgment should be entered in favor of McDonald's on count II in the amount of the unpaid fees which Davis would have owed for operating the restaurants from January 14, 1997 to July 16, 1997, plus an additional $50,000, or a total of $352,211.52. In accordance with § 1117(a), this sum represents compensation and not a penalty. The Court also finds that this is not an exceptional case; McDonald's is not entitled to its reasonable attorneys' fees incurred in prosecuting this claim. McDonald's request for injunctive relief under this count will be denied for the same reasons this Court declined to enter an injunction under count I.

In count III, McDonald's sues for the amount of unpaid fees which Davis owed McDonald's for operation of the restaurants from August of 1996 through January 14, 1997. There is undisputed evidence that this amount is $198,185.39. For the reasons stated above, summary judgment will be entered in favor of McDonald's on this count. Summary judgment is denied, however, as to McDonald's claim for attorney's fees under count III since it has failed to provide this Court with any basis for such an award.

## V. Conclusion

Accordingly, it is hereby **ORDERED:**

1. McDonald's motion for summary judgment in Case No. 3:96cv494 (doc. 57) is **GRANTED** in part and **DENIED** in part. Summary judgment is hereby entered in favor of McDonald's on counts I, II, V, and VIII of Davis' amended complaint. Summary judgment is further hereby entered in favor of McDonald's on counts III, IV, VI, and VII only insofar as those claims are based on alleged misrepresentations occurring before the execution of the parties' franchise agreements. McDonald's motion is **DENIED** as to counts III, IV, VI, and VII insofar as those claims are based on alleged misrepresentations occurring after the execution of the parties' franchise agreements.

2. McDonald's motion for summary judgment in Case No. 3:97cv23 (doc. 49) is **GRANTED** in part and **DENIED** in part. Count I of McDonald's complaint is dismissed without prejudice. Partial summary judgment is hereby entered in favor of McDonald's on counts II and III of McDonald's complaint as set forth above. Judgment is entered in favor of McDonald's in the amount of $500,-396.91. Within ten days from the date of this order, the parties shall file memoranda with the Court indicating how the judgment should be allocated with re-

---

chisee's remedy for wrongful termination [of a franchise] is an action for money damages, and not the continued unauthorized use of its franchisor's trademarks." 770 F.Supp. at 638; *see also S&R Corp. v. Jiffy Lube Int'l. Inc.*, 968 F.2d 371, 376–378 (3rd Cir.1992).

Thus, even had this Court denied summary judgment on Davis' claims for breach of contract and breach of the covenant of good faith and fair dealing, summary judgment for McDonald's on its trademark infringement claim would still be warranted.

spect to Joseph Davis and J.C. Davis Foods, Inc.