C. G. CASTER COMPANY, Plaintiff and Counterdefendant-Appellant, *v.* ROBERT J. REGAN, Defendant and Counterplaintiff-Appellee.

First District (4th Division)    No. 79-1156

Opinion filed September 4, 1980.—Rehearing denied October 2, 1980.

Pretzel, Stouffer, Nolan & Rooney, of Chicago (Thomas A. Carton, Robert Marc Chemers, and Joseph B. Lederleitner, of counsel), for appellant.

Head, Johnson, Martin & Parisek, of Chicago (P. Sveinbjorn Johnson, John T. Martin, and Michael K. Shannon, of counsel), for appellee.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

Robert J. Regan, the defendant and counterplaintiff, entered into an employment agreement with the C. G. Caster Company (Caster), the plaintiff and counterdefendant. The business of the Caster Company is the investigation and adjustment of insurance claims. The employment agreement contained a restrictive covenant which would go into effect upon Regan's separation from the company. The agreement also provided that either party could terminate the contract for cause and that upon termination for cause Regan was to receive certain monetary benefits. The employment agreement and a concurrent stock purchase agreement were executed on February 2, 1972. The employment agreement was amended on January 10, 1973. Regan was terminated on May 6, 1975. Upon termination Regan commenced his own insurance adjusting business with offices in Joliet, outside the area covered by the restrictive covenant, but he did accept business within the proscribed area.

Caster claims it is entitled to damages because Regan breached his fiduciary duties while an officer and director of the Caster Company and also because Regan breached the restrictive covenant provision. Regan replies that he breached no fiduciary duties while employed by Caster; that he was not bound by the restrictive covenant provision after his termination because Caster did not pay him under the termination clause; and that he is entitled to a judgment for the amounts due under the termination

provisions. Caster responds that he does not owe Regan under the termination provisions because of Regan's breaches. Alternatively, Caster contends that if the court finds Regan is due termination benefits despite his breaches that Caster's failure to pay those monies at the time of Regan's termination was not a material breach because Caster offered Regan what Caster reasonably believed was due under the termination provision.

The trial court found for Regan on Caster's claim for damages for breach of the restrictive covenant and breach of fiduciary duties. The court also found for Regan on his claim for termination payments under the contract and entered judgment in the amount of $89,686.19. Caster appeals from both of these judgments.

Regan initiated the litigation between the parties by filing a declaratory judgment action on May 19, 1975, alleging that demands had been made upon Caster for his termination benefits to no avail. The complaint sought a money judgment and a declaration that the restrictive covenant was void. Six months later Caster filed this action seeking a temporary injunction to enjoin Regan's violation of the restrictive covenant and also seeking money damages. The allegations contained in Regan's complaint for declaratory judgment formed the basis of his counterclaim in the action for equitable relief. The trial court denied the temporary injunction. That order was reversed on appeal and remanded with directions to enter the requested relief in *C. G. Caster Co. v. Regan* (1976), 43 Ill. App. 3d 663, 357 N.E.2d 162.

Under the terms of the employment agreement, Caster hired Regan as a director, officer and general manager for a salary of $20,000 per year plus 10% of the net profits for the preceding year multiplied by the years of service up to a maximum of 50% and other benefits. The restrictive covenant, contained in the amendment to the agreement, provided that for a period of two years following termination of the agreement Regan would not engage in the business of investigating and adjusting insurance claims in the area limited by a 38-mile radius from Caster's offices in downtown Chicago.

Caster contends that Regan breached his fiduciary duties by deliberately trying to get fired and that he planned to start his own business which was evidenced by the fact that he filed articles of incorporation for his new business a mere two days after his termination. The evidence on that issue included the testimony of Charles G. Caster, president of the Caster Company, that he discharged Regan because of Regan's refusal to follow established procedures; Regan's improper supervision of Caster employees and failure to make business development contacts which he was instructed to make; and for making other contacts which Caster thought were wasteful. Charles Caster testified that Regan also refused to comply with direct orders including a request that a written program of supervision

be initiated. William Wilie, the Caster Company attorney, testified that following a meeting held four days after Regan's termination, Regan told him he was "doing things" to get fired and that he was prepared when the firing occurred. Regan denied making such a statement. The articles of incorporation for Regan's new business were introduced into evidence. They were filed with the Secretary of State in Springfield two days after Regan's termination by Caster. Regan testified that as soon as he received the termination notice he contacted his attorneys and advised them that his only recourse was to go into business for himself.

■■ Concerning the alleged breach of fiduciary duties, the trial court found that Caster had not proved most of its allegations concerning the reasons for Regan's discharge, that Caster had "some cause" to terminate Regan but that there was no intentional scheme on Regan's part to bring about his own termination, that there was no showing that Regan had violated any fiduciary duties, and that Caster was simply "dissatisfied" with Regan's performance. We believe the trial court was correct.

The fiduciary obligations of a corporate officer or director have been described in the following terms:

> "The duties that an officer or director owe to his corporation are so well established as to need no citation of authority to support them. They include the requirement of undivided, unselfish, and unqualified loyalty, of unceasing effort never to profit personally at corporate expense, of unbending disavowal of any opportunity which would permit the fiduciary's private interests to clash with those of his corporation." *Patient Care Services, S.C. v. Segal* (1975), 32 Ill. App. 3d 1021, 1029, 337 N.E.2d 471, 478.

The testimony at trial did not demonstrate that Regan was disloyal or that he profited personally at Caster's expense during his years of employment with that company. Caster relies on Regan's filing of articles of incorporation a mere two days after his termination as evidence that he was setting up a competing business while still employed by Caster. The trial court made no express finding on this point but apparently rejected it in light of its conclusion that no breach of fiduciary duties was proved. We cannot agree with Caster's apparent position that it would be impossible for a person to draft and file articles of incorporation in a period of 48 hours, and we cannot say this fact demonstrates that Regan was guilty of a breach of his fiduciary duties. Additionally, it is clear from the trial court's findings that it did not find credible Wilie's testimony that Regan was deliberately attempting to get fired. As trier of fact, the court was entitled to so conclude.

Caster also asserts that it is entitled to damages resulting from Regan's breach of the restrictive covenant. Regan admits violating that covenant and the pertinent issue on appeal is not whether he breached but whether

he was justified in so doing. Due to our subsequent disposition of this question in Regan's favor, it is not necessary to relate Caster's evidence on damages.

The counterclaim brought by Regan for amounts due under the termination clause relies on the amendment to the employment agreement which provides, in part:

> "12. This agreement may be terminated by either party with cause upon 30 days written notice and in the event the agreement is so terminated by the company, Regan shall be paid (a) the stipulated value of any stock in the Company as defined in a certain [stock purchase] agreement between the parties, C. G. Caster and the La Salle National Bank of even date; and (b) any other sums due by reason of undistributed share of profits * * *, expenses * * *, and the pro-rata vacation salary * * *."

The stock purchase agreement referred to above provides, in part:

> "7. For the purpose of this agreement and the employment agreement annexed hereto the party shall stipulate each year the value of the stock as of December 31st and file each stipulated value with the Trustee for use in the following year."

Regan's counterclaim sought judgment for the value of the 56.25 shares of Caster stock which he owned. According to the counterclaim, the stock was worth $1,320.22 per share or a total of $74,262.37. Regan also sought $11,833 for 10% of the profit distribution from 1974 (Caster admitted at trial that Regan should have received an additional 10% of the 1974 profits at the time of the March 1975 distribution); $1,826.66 for one month's termination salary; $996.36 for 12 days vacation; $402.12 for April and May expenses; and $365.28 for six days salary in May of 1975.

On May 5, 1975, a day before Regan was terminated, Caster and Regan signed a letter stipulating "[t]he value of the stock in the corporation for the year 1974, shall be $1,320.22." That figure represented the company's book value as of December 31, 1974. Caster said that at the time he signed the letter his intent was to certify as of December 31, 1974, and not as of May 5, 1975. The actual book value of Regan's stock on May 5, 1975, the day he was discharged, was $41,892.31 or $744.75 per share. Caster explained that the value of the shares decreased from the stipulated value of $1,320.22 as of December 31, 1974, to $744.75 as of May 5, 1975, because the company distributed almost $120,000 in profits in March of 1975 and the company's value was thus reduced by that amount. Caster contends that if Regan's stock payment upon termination were based upon the $1,320.22 figure he would in effect be paid twice out of the same fund.

Caster said he presented Regan with a letter of termination along with a severance pay check in the amount of $1,334.70 on May 6, 1975. The

check represented Regan's net income for one month. Regan's attorney subsequently returned the severance check to Caster.

Caster testified that on the day Regan was discharged he offered to settle the remaining matters for a sum including $42,018.75 which he thought represented the value of the stock as of that date. (There is no explanation in the record for the slight discrepancy between this figure and the figure which Caster described as the actual book value of Regan's stock on May 5, 1975.) At the hearing on the petition for a preliminary injunction Caster said he offered Regan a total amount of $66,000 which included the value of the stock, Regan's termination pay and expense accounts. Regan said that Caster's offer was for $35,000 and that Caster said he would pay it to Regan over the same number of years as it took Regan to acquire the stock.

In its oral ruling at the close of the evidence on the counterclaim, the trial court found Caster did not abide by the terms of the agreement which required it to pay Regan certain monetary benefits and was thus in no position to seek enforcement of the restrictive covenant. The court also found that the correct value of the stock was $1,320.22 per share and awarded Regan $89,686.19.

Caster's first argument touches two issues: (1) whether Regan was justified in disregarding the restrictive covenant; and (2) whether Regan forfeited any termination benefits as a result of his breach of the restrictive covenant. In this regard, Caster contends (1) that the termination payments provision was not a material part of the contract; and (2) that even if material, it was not breached.

■■ "[A] party may terminate or rescind a contract because of substantial nonperformance or breach by the other party." (*Eager v. Berke* (1957), 11 Ill. 2d 50, 54, 142 N.E.2d 36, 38.) "A total breach of contract is a nonperformance of duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end." (A. Corbin, Contracts §946, at 925 (1952).) Whether or not a breach is material and important is a question of degree which must be answered by weighing the consequences of the breach in light of the actual custom of persons in the performance of contracts similar to the one involved in the specific case. A. Corbin, Contracts §946, at 925 (1952).

The question thus becomes whether the evidence supports the trial court's conclusion that Caster's actions amounted to a nonperformance of duty that was so material and important as to justify Regan in regarding his promise to abide by the restrictive covenant no longer binding. We believe the trial court's finding that, in effect, Caster's failure to pay termination benefits constituted a material breach of the contract is supported by the evidence.

■■ Caster argues the termination provision does not go to the essence of the contract and that the main purpose of the contract was "to establish the employment relationship and the attendant duties and responsibilities." We agree that the main purpose of the contract was to establish the employment relationship and the attendant duties and responsibilities of the parties. We also believe that while payment of expenses, vacation time and one month's severance pay may be incidental to this main purpose, payment for 30% of the corporate stock was a material and important part of Caster's contractual duties.

Caster argues he did not breach the contract because he never refused to pay the termination benefits, that he merely disputed how the stock was to be valued under the terms of the contract. Caster's sole authority for the contention that his actions did not constitute a breach is *Herbert Shaffer Associates, Inc. v. First Bank of Oak Park* (1975), 30 Ill. App. 3d 647, 332 N.E.2d 703. In *Shaffer*, this court found the parties' disagreement concerning the meaning of a contract provision did not rise to the level of a clear breach of contract. The *Shaffer* court did not hold that a disagreement concerning a contract term could never amount to a material breach.

■■ The trial court was justified in finding Caster breached the contract by disputing the value of the stock in light of the very explicit contract language. The employment agreement provided, in part, that Regan would be paid, upon termination, "the stipulated value of any stock in the Company as defined in a certain shareholder's agreement * * *." The shareholder's agreement in turn provided that "the party shall stipulate each year the value of the stock as of December 31st and file each stipulated value with the Trustee for use in the following year." The party's letter of May 5, 1975, to the Trustee stipulated the value of the stock "for the year 1974, shall be $1,320.22."

We find this language unambiguous and believe it manifests the parties' intent that the $1,320.22 figure would be used to determine the value of Regan's stock, if he were terminated during the year 1975. Although there may be some merit to Caster's argument that the stock was no longer worth $1,320.22 in May of 1975 because almost $120,000 in profits had been distributed in March of that year, we would not be justified in reading an "as adjusted" proviso into the contract. The contract requirement that the parties stipulate the value of the stock each year was clearly included for the purpose of avoiding the very type of dispute which we are addressing here. Charles Caster testified that the company was obligated to distribute all profits annually. This annual distribution of profits meant that the company's book value would fluctuate greatly during the course of each year. The parties could have included a requirement that the stipulated value be "adjusted" to reflect this variable book value if a

situation arose, such as Regan's termination, where a value had to be placed on the stock at some point in time other than during the annual distribution of profits. The contract gives no indication that the stipulated value should have been adjusted for purposes of determining the value of Regan's stock upon termination and we conclude that Caster acted unreasonably in construing the contract to mean anything different. We also note that according to Regan, Caster's offer was to pay the termination benefits over a number of years rather than upon Regan's termination. Although we cannot tell from the record whether the trial court found this testimony credible, this would be further evidence of a breach by Caster if believed.

■■ In connection with the amount of the judgment, Caster argues paragraph 17 of the employment agreement prevents the type of "double recovery" which, it alleges, occurred here. Paragraph 17 states, in part:

> "Regan has been granted the option of acquiring up to 49% of the outstanding shares of capitol stock of the Company. In the event Regan elects exercise [*sic*] such options, his additional compensation [consisting of a share of the profits], shall abate by that amount he shall be entitled to receive as a shareholder."

Caster contends the judgment entered below is erroneous because it allows Regan to recover both on the basis of the amount of stock he owns as a shareholder, and, additionally, in the distribution of profits. We cannot agree. Paragraph 17 was intended to prevent Regan from receiving a double share of the profits which were to be distributed at the end of each year of his employment. We believe monies payable upon termination, covered by a different section of the contract, are distinct from the situation covered by paragraph 17 which contemplates an ongoing employer-employee relationship.

Caster's final argument on appeal is that the judgment entered below was erroneous because it allowed Regan to recover the amount of his severance paycheck. Caster contends that because he tendered to Regan a check in the amount of $1,334.70 for one month's severance pay, and because Regan subsequently returned the check to Caster, that Caster's duty to pay that portion of the judgment was extinguished.

The effect of such a tender was explained in Corbin on Contracts:

> "[T]ender of payment does not operate as a discharge of the debt, even though the exact amount due is tendered at the very time and place specified in the original contract. * * * The refusal by the creditor of a proper tender of the money due him is operative to prevent the debtor from being guilty of a breach of duty, although it is not a discharge of his duty." 5A A. Corbin, Contracts, §1233, at 520-21 (1964).

■■ Regan's refusal of the check for $1,334.70 tendered by Caster pre-

vented Caster from being guilty of a breach of duty on that basis, but did not discharge Caster from his duty of paying Regan severance pay amounting to one month's wages.

For the foregoing reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LINN, P. J., and ROMITI, J., concur.