2020 IL App (1st) 190859-U
Order filed: March 16, 2020
Modified order upon denial of rehearing filed: May 8, 2020

FIRST DISTRICT
FIFTH DIVISION

No. 1-19-0859

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| DAVID GIAMBRUNO, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee/Cross-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 16 L 9995 |
| | ) | |
| TRIBUNE MEDIA COMPANY, a | ) | |
| Delaware Corporation, | ) | Honorable |
| | ) | Patrick J. Sherlock, |
| Defendant-Appellant/Cross-Appellee. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Hoffman and Justice Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirmed the judgment in favor of plaintiff on his breach of contract action against his former employer, the Tribune Media Company, finding that he was owed severance payments under the separation agreement. We affirmed the judgment in favor of plaintiff on all of the Tribune's counterclaims for breach of fiduciary duties, fraud, conspiracy, rescission, and unjust enrichment, finding that the Tribune had failed to prove all the elements thereof. Finally, on plaintiff's cross-appeal, we affirmed the grant of summary judgment in favor of the Tribune on plaintiff's claim under the Wage Act, finding that the severance payments were not final compensation subject to the Act.

¶ 2    Plaintiff, David Giambruno, filed a complaint against his former employer, the Tribune Media Company (Tribune), for breach of contract and a violation of the Illinois Wage Payment and Collection Act (Wage Act) (820 ILCS 115/5 (West 2016)), arising out of the Tribune's refusal to pay him all the monies allegedly owed him under a separation agreement. The Tribune filed counterclaims against plaintiff for breach of contract, breach of fiduciary duty, fraud, aiding and abetting fraud, conspiracy, unjust enrichment, and rescission. The trial court granted summary judgment in favor of the Tribune on plaintiff's claim under the Wage Act.  After a bench trial, the court entered judgment in favor of plaintiff on his breach of contract claim and against the Tribune on all of its counterclaims and awarded plaintiff $603,665.13. The Tribune appeals the court's ruling, after the bench trial, in favor of plaintiff on his breach of contract claim and against the Tribune on all of its counterclaims. Plaintiff cross-appeals the trial court's grant of summary judgment in favor of the Tribune on plaintiff's Wage Act claim. We affirm on the appeal and on the cross-appeal.

¶ 3    In count I of its complaint for breach of contract, plaintiff alleged that he was formerly employed as an "executive" at the Tribune until he entered into a separation agreement with the Tribune on June 13, 2016. Pursuant to the separation agreement, the Tribune was to pay him a cash severance in the amount equal to his fiscal year 2015 base salary, and it was also to make bi-weekly payments to him in the amount of his annual bonus for the fiscal year 2015. The Tribune was also required to maintain his health, dental, and vision benefits. Plaintiff performed all of his obligations under the separation agreement, but the Tribune breached the agreement by failing to make the initial cash severance payment, by failing to make any of the bi-weekly payments, and by failing to continue his health, dental, and vision benefits.

¶ 4      In count II, plaintiff alleged that the Tribune had failed to pay him his final compensation as required by section 5 of the Wage Act (820 ILCS 115/5 (West 2016)).

¶ 5      The Tribune filed counterclaims alleging that before starting work with the Tribune in December 2013, plaintiff worked for Revlon. Upon leaving Revlon for the Tribune, plaintiff signed a separation agreement with Revlon prohibiting him from soliciting Revlon employees to join him at the Tribune.

¶ 6      Soon after starting employment with the Tribune in December 2013, plaintiff hired CSE Consulting, LLC (CSE), a company that provides computer application and hardware counseling, to assist him. Some of the CSE consultants who plaintiff wished to employ at the Tribune were, at the same time, working full-time for Revlon. So as not to alert either Revlon or the Tribune that he was violating the separation agreement with Revlon by hiring their employees to assist him at the Tribune, plaintiff engaged in a fraudulent scheme (the scheme to defraud) with CSE's owner whereby those CSE consultants who joined him at the Tribune used pseudonyms to hide their true identities from the Tribune.

¶ 7      In count I, the Tribune alleged that plaintiff breached his fiduciary duties toward it by engaging in CSE's scheme to defraud and by failing to adequately review CSE's invoices, thereby enabling CSE and its consultants to overbill the Tribune.

¶ 8      In count II, the Tribune alleged that plaintiff committed fraudulent misrepresentations and omissions in order to perpetuate CSE's scheme to defraud.

¶ 9       In count III, the Tribune alleged that plaintiff aided and abetted CSE in the scheme to defraud.

¶ 10      In count IV, the Tribune alleged that plaintiff engaged in a civil conspiracy with CSE, and with CSE's owner and employees, to perpetuate the scheme to defraud.

¶ 11    In count V, the Tribune alleged that plaintiff signed a separation agreement with the Tribune prohibiting him from soliciting Tribune employees to join him in his new company. Plaintiff breached the separation agreement with the Tribune by soliciting a Tribune employee to work for him in his new company.

¶ 12    In count VI, the Tribune alleged that the separation agreement it entered into with plaintiff should be rescinded, and the $155,000 that the Tribune paid to plaintiff under the agreement should be returned to it, because plaintiff failed to disclose material facts related to his participation in CSE's scheme to defraud. The Tribune alleged that it would not have entered into the separation agreement and made the payments to plaintiff had it known of the scheme.

¶ 13    In count VII, for unjust enrichment, the Tribune alleged that due to plaintiff's participation in CSE's scheme to defraud, it is entitled to the return of the $1.9 million in salary and other benefits that it paid to plaintiff during his employment, as well as the $155,000 it paid plaintiff pursuant to the separation agreement.

¶ 14    The cause proceeded to trial. Edward DeSimone testified that he and his wife, Kim Parke, run CSE. Sometime in 2008 or 2009, CSE was hired to provide consulting services for the information technology (IT) division of Revlon. Plaintiff was the chief information officer (CIO) of Revlon, and he directed the projects that CSE consulted on. Plaintiff directed DeSimone to hire certain persons, including John Wilantowicz, David Williams, Richard Dineen, and Mike Cannella, to work with CSE in performing IT work for Revlon. CSE did consulting work for Revlon for about four years.

¶ 15    In 2013, plaintiff left Revlon and was hired by the Tribune to manage the IT-related aspects of the Tribune's split of its publishing and broadcasting divisions. In December 2013, Steven Berns, the chief financial officer (CFO) of the Tribune, hired CSE to consult with plaintiff in

managing the IT-related aspects of the split. Plaintiff told DeSimone that they only had six months to accomplish the split.

¶ 16    Plaintiff regularly told DeSimone what he wanted to be done, and DeSimone then prepared a "statement of work," describing the work to be done, the people being assigned to the work, and the dollar value of the work. DeSimone sent each statement of work to Kathy Jurgeto, the Tribune's director of procurement (Procurement Director), who reviewed and then approved each statement of work.

¶ 17    DeSimone brought over Rick Dineen and Mike Cannella (who had worked with him at Revlon) to help CSE perform the IT work at the Tribune. Dineen and Cannella were still consulting for Revlon at the time that DeSimone hired them to perform IT work at the Tribune, and they wanted to continue to work for, and draw paychecks from, both Revlon and the Tribune. Fearful that Revlon would fire them for also doing IT work for the Tribune, Dineen and Cannella used pseudonyms while working at the Tribune. Dineen and Cannella apparently thought that the use of pseudonyms would prevent Revlon from discovering that they were spending some of their time working for the Tribune. Each used his middle name as his first name, and his wife's maiden name as his last name.

¶ 18    DeSimone was aware of Dineen's and Cannella's use of pseudonyms while working for the Tribune. Their use of pseudonyms "was discussed with" plaintiff, but DeSimone "can't say at what point in time it was discussed with" plaintiff. DeSimone recalled one time when he mistakenly wrote Cannella's actual name on a statement of work, and plaintiff called DeSimone and screamed at him "that that was not acceptable." In response, DeSimone rewrote the statement of work, using Canella's pseudonym.

¶ 19    DeSimone testified that there were other CSE employees who performed IT work for the Tribune in conjunction with the split of the publishing and broadcasting divisions, and who also used pseudonyms. These employees included Sujan Manjeshwar, Piotr Prussak, Pritam Dahake, and John Wilantowicz.

¶ 20    DeSimone was asked at trial how these employees were paid, since they were not using their real names, and he replied that some of them "had LLCs established, that they wanted to pay the LLC. And then two of the guys didn't want to go through the trouble of establishing an LLC, and they were paid through Mike Canella."

¶ 21    Eventually, plaintiff decided to hire Cannella, Prussak, Dahake, and Wilantowicz to perform full-time IT work for the Tribune, meaning they no longer had to use pseudonyms to hide their real identities because they would no longer be working for Revlon. DeSimone sent out emails to Tribune employees indicating that the work performed by Cannella, Prussak, Dahake, and Wilantowicz under their pseudonyms was now going to be performed by new hires. DeSimone then identified the new hires by their *actual* names, not by their pseudonyms.

¶ 22    Plaintiff testified that he was the CIO of Revlon from 2009 to 2013, where his duties included "providing the platforms for the company to do business, protecting the company from cybersecurity." At Revlon, plaintiff worked under Steven Berns, who later left Revlon to become the CFO of the Tribune.

¶ 23    In December 2013, plaintiff came to work for the Tribune to manage the IT-related aspects of the split of its publishing and broadcasting divisions. The chief executive officer (CEO) of the Tribune, Peter Liguori, told plaintiff that his work effectuating the split was required to be performed by August 2014 in order to ensure that a $275 million dividend would be paid to Tribune shareholders.

¶ 24    Berns recommended that plaintiff talk to DeSimone about hiring CSE to assist in his work for the Tribune. After speaking with DeSimone, plaintiff gave Jurgeto a list of CSE consultants for her to "vet," meaning she ensured that "they could do the job, that the terms and conditions were favorable for the corporation and that the work would be delivered in a quality manner." Plaintiff did not give Jurgeto the names of any CSE consultants who were still performing work for Revlon.

¶ 25    Plaintiff subsequently became aware in January or February of 2014 that CSE consultants including Cannella, Dineen, Dahake, Prussak, and Manjeshwar, were assisting CSE in their work for the Tribune while also working for Revlon, and that they were using pseudonyms to hide their true identities. Plaintiff testified that he never directed Dineen, Dahake, Prussak, Manjeshwar, or Cannella to use pseudonyms while working for the Tribune, nor did he direct DeSimone to have them use pseudonyms.

¶ 26    Upon learning of the CSE consultants' work for the Tribune and for Revlon, and their use of pseudonyms, plaintiff told DeSimone to "go tell procurement immediately." Plaintiff then immediately informed Berns that "some of the guys from Revlon are here, they're using alias names." Berns responded, "I don't care, we need to get this company split, it's the most important thing in the world, it's the most important thing to the shareholders. Don't worry about it, just get back to work and keep this thing on schedule."

¶ 27    Plaintiff testified that the split of the IT departments was accomplished by the August 2014 deadline and under budget.

¶ 28    Plaintiff left the Tribune's employ in May 2016. Plaintiff entered into a separation agreement with the Tribune, pursuant to which he would receive $759,459.25. The Tribune has paid plaintiff $155,794.12, and still owes him $603,665.13.

¶ 29   The separation agreement contained a non-solicitation clause, which stated that plaintiff agreed that he "shall not, directly or indirectly, without the prior written consent of the Company":

"While an employee of the Company and during the one-year period following termination of employment for any reason, (A) solicit, recruit or hire, or attempt to solicit, recruit or hire, any employees of the Company or persons who have worked for the Company during the 12-month period immediately preceding such solicitation, recruitment or hiring or attempt thereof (other than your secretary/executive assistant); *** provided that the preceding clause (A) shall not prohibit you from conducting a general solicitation made by means of a general purpose advertisement not specifically targeted at employees or other persons or entities described in clause (A) or soliciting or hiring any employee or other person or entity described in clause (A) who is referred to you by search firms, employment agencies or other similar entities, provided that such firms, agencies or entities have not been instructed by you to solicit any such employee or person or entity or category thereof."

¶ 30   After leaving the Tribune's employ, plaintiff became CIO of Shutterstock in June 2016.

¶ 31   Plaintiff testified that he never solicited any Tribune employee to work for Shutterstock. However, some Tribune employees did end up working at Shutterstock, including Cannella, Prussak, Dahake, David Murray, Ryan McKenzie, and Jim Rackus. Plaintiff testified:

"Q. Did they call you or—at any time with regard to employment at Shutterstock?

A. They called me.

Q. Did you call them first?

A. No, no.

Q. Who reached out first?

A. They did.

Q. And what, if anything, did you tell them when they reached out to you?

A. I'd tell them [that] I have a contract in place that prohibits me from interacting with you to recruit you or doing anything, that's in effect for a year, I can't help.

Q. Did you tell them to go ahead and apply for any job they wanted to at Shutterstock?

A. No, that was pretty much the end of the conversations.

Q. Did you have anything to do with recruiting any of these individuals for Shutterstock?

A. No."

¶ 32　On cross-examination, plaintiff testified that when Prussak applied for a job with Shutterstock, plaintiff "recused [himself] from the HR process." Plaintiff was impeached with his amended answers to the Tribune's first set of interrogatories, in which he stated that he hired Prussak to work at Shutterstock after Prussak was fired from the Tribune. Prussak began work at Shutterstock in January or February 2017.

¶ 33　On redirect examination, plaintiff testified that none of the Tribune board of directors ever criticized his performance with regard to the IT-related aspects of the split of the publishing and broadcasting divisions, and that instead they gave him compliments and a $120,000 bonus. Plaintiff was asked whether the use of pseudonyms by six CSE consultants caused any financial harm to the Tribune, and plaintiff responded:

"There was no damage, and we delivered the project on time, under budget, and the shareholder or investors received a $275 million dividend."

¶ 34　No Tribune employee ever complained about the quality of the work performed by the CSE consultants who used the pseudonyms.

¶ 35    Plaintiff further testified that he had performed all of his duties and obligations under the separation agreement.

¶ 36    Pritam Dahake testified that he was the director of global application and architecture at Revlon from about 2010-2014. While at Revlon, Dahake worked with DeSimone, who owned CSE. In 2014, DeSimone asked Dahake to work as a CSE consultant to the Tribune. DeSimone told Dahake he would have to use a pseudonym while consulting with the Tribune. Dahake did not ask why he would have to use a pseudonym, but his "guess" was because he was also working full-time at Revlon at the same time.

¶ 37    Dahake began working as a CSE consultant to the Tribune, using the pseudonym Arvind Sonalkar, in April 2014. Dahake worked with other CSE consultants, including Prussak, Cannella, Manjeshwar, and Dineen, all of whom also used pseudonyms. Dahake was paid through a limited liability company he owned.

¶ 38    In August or September 2016, Dahake left the Tribune and went to work for Shutterstock as a senior director of data and integration. Dahake found a job at Shutterstock via a Shutterstock recruiter.

¶ 39    Richard Dineen testified that he works as a global network architect at Revlon, and that he "basically run[s] the network for Revlon worldwide." While at Revlon, DeSimone asked him to work as a CSE consultant for the Tribune. DeSimone explained that Dineen would have to use a pseudonym while consulting for the Tribune, so that "people don't say a bunch of Revlon people are taking over *** this project." Dineen agreed to do so. As far as he was aware, plaintiff did not know that he was using a pseudonym while consulting for the Tribune.

¶ 40    Thomas Caputo, the vice president of internal audit and compliance for the Tribune, testified that he leads "a group of audit professionals who audit, evaluate controls, operating

procedures for finance, information technology looking for improvements" and that he also leads "fraud investigations as directed or as-needed."

¶ 41    Caputo explained that after emerging from bankruptcy in 2013, the Tribune decided to split into separate publishing ("Tribune Publishing") and broadcasting divisions ("Tribune Media"). Plaintiff was hired as senior vice president and CIO to effectuate "the split of the IT system between publishing and broadcasting." Plaintiff was responsible for "supporting management in identifying hardware and software that would meet the needs of the growing organization and implementing those *** new systems, making sure those systems were functional and secure and met the needs of the business partners." For example, plaintiff was responsible for setting up the email system, network, and servers.

¶ 42    Plaintiff had supervisory authority over about 100 employees and consultants, with the ability to hire and fire them, and to recommend pay increases and bonuses. Plaintiff also had the ability to recommend and select vendors and negotiate contracts with them, and he initially was able to "enter agreements with vendors for hardware/software services between $50,000 and $500,000." In 2015, though, plaintiff's "approval authority" was lowered to $250,000.

¶ 43    When plaintiff recommended that a particular vendor be hired, the IT procurement department would facilitate the signing of the appropriate contracts so that the vendor could begin working for the Tribune. The procurement department also helped the vendor in the preparation of the statement of work setting forth the work to be performed and the rate of pay. The statement of work was sent to plaintiff, for him to sign.

¶ 44    Plaintiff hired CSE to perform consulting work for the Tribune in connection with the IT split. Plaintiff approved CSE's invoices, purchase orders, and statements of work.

¶ 45    Jurgeto helped facilitate the signing of the appropriate contracts so that the CSE consultants could begin working for the Tribune. Caputo testified on direct examination that he did not know whether or not Jurgeto knew that certain of the CSE consultants were using pseudonyms while doing IT work for the Tribune. On cross-examination, though, Caputo testified that his investigation revealed that Jurgeto knew that the CSE consultants were using pseudonyms while consulting for the Tribune, but she did nothing to stop it.

¶ 46    Caputo testified that the Tribune paid plaintiff $155,794.12 under the separation agreement, before suspending payments in August 2016 because an accounts payable clerk noticed some "suspicious payments" to CSE. Caputo investigated and uncovered that some of the CSE employees were using pseudonyms.

¶ 47    Caputo testified that CSE consultants Canella, Manjeshwar, Prussak, Dahake, and Wilantowicz, each used a pseudonym for several months while consulting for the Tribune; invoices were sent to the Tribune using the pseudonyms, and the Tribune was billed hundreds of thousands of dollars for the work performed under the pseudonyms. Cannella, Manjeshwar, Prussak, Dahake, and Wilantowicz subsequently applied for full-time employment with the Tribune's IT department, using their real names; they did not inform the Tribune of their previous consulting work under their pseudonyms. Prussak, Dahake, and Wilantowicz each indicated on his employment application for full-time work that he had been referred by plaintiff.

¶ 48    Caputo testified that the Tribune would not have hired the CSE consultants had it known that they were using pseudonyms to hide the fact that they were also performing consulting work for Revlon:

    "Q. Does Tribune allow its full-time IT consultants to be full-time employees at another company?

-12-

A. No.

* * *

Q. Why?

A. A couple of reasons. *** People who work in IT, it is [a] very sensitive area with sensitive information. So you want to make sure you know who is accessing it. And, also, if they're working for another company, I would have doubts as to where their loyalties really lie. We expect when we're hiring a full-time contractor to work for us, then we expect them to be available full-time. If they're working full time for another organization, we would not be able to have access to them.

Q. Does Tribune expect its IT consultants to disclose their identities to the company when working for the company?

A. Yes.

Q. Why?

A. You want to know who is working for you, again access to sensitive information. You have your consultants sign these confidentiality agreements. If there is some breach of confidentiality, if there was a security breach of some sort, we wouldn't know who to hold accountable and be able to enforce those agreements if they were signed by somebody and we didn't know who they were."

¶ 49     Donna Renn testified she was an IT consultant for the Tribune and had previously worked as an IT consultant at Revlon. While she was at Revlon, Renn worked with Steven Berns, the CFO of Revlon. At Revlon, Berns created a program called the "Table of Authority." Renn explained that the Table of Authority "is a program that—where people request to spend money, and when they do request to spend money, it has controls in it so people approve those requests." Two CSE

consultants, Dahake and Prussak, wrote the computer code for the Table of Authority, and they worked closely with Berns while at Revlon.

¶ 50    Eventually, Berns came to work for the Tribune, and he brought his Table of Authority concept with him. Dahake and Prussak were brought on as CSE consultants to the Tribune to help Berns establish the Table of Authority, and they continued to work closely with him. Both Dahake and Prussak used pseudonyms when they first began consulting at the Tribune.

¶ 51    Mark Pearson, a forensic accountant and certified fraud examiner, testified that in June 2016, he was retained by the Tribune to investigate certain questionable IT expenditures. Pearson performed a forensic accounting, during which he performed an analysis of CSE's billing of the Tribune. He reviewed CSE's invoices, time sheets, and 1099 tax forms.

¶ 52    Pearson testified on direct examination that he determined 13 CSE consultants had collectively overbilled the Tribune $190,337.17 for 1,252.74 hours they had not actually worked. On cross-examination, though, Pearson testified that he had not seen a complete set of CSE's time sheets, and that he had not reached an opinion as to whether CSE overbilled the Tribune, or whether CSE had "fraudulently billed" the Tribune.

¶ 53    Following all the evidence, the trial court found that plaintiff had proved his breach of contract claim. The court found that the separation agreement between plaintiff and the Tribune was a contract and that plaintiff had fully performed all of his duties and obligations under the contract and was owed $603,665.13 in severance payments. The court noted that plaintiff had violated the non-solicitation provision of the separation agreement when he hired former Tribune employees to join him at Shutterstock within one year of his separation from the Tribune. The trial court determined, however, that the non-solicitation provision preventing him from hiring former Tribune employees was overly broad and unenforceable.

¶ 54    The trial court found that the Tribune had failed to prove its counterclaims that plaintiff engaged in fraud and breached his fiduciary duty to it by participating in CSE's scheme whereby certain CSE consultants contracted with the Tribune using pseudonyms to hide their identities. The court found that the Tribune's claims failed because upon learning about the CSE consultants' use of pseudonyms, plaintiff immediately informed Tribune executives, including Berns and Jurgeto, and they did not object thereto. Instead, plaintiff was told to continue using the CSE consultants to facilitate the IT split.

¶ 55    The trial court found that the Tribune had failed to prove its counterclaim that plaintiff breached his fiduciary duty to it by failing to adequately review CSE's invoices, thereby enabling CSE and its consultants to overbill the Tribune. The court found that there was no evidence that plaintiff knew that CSE overbilled the Tribune or that the plaintiff received any benefits from the alleged overbilling.

¶ 56    The trial court found that the Tribune had not proven its counterclaim for unjust enrichment, where it failed to prove that plaintiff had unjustly retained a benefit to the Tribune's detriment.

¶ 57    The trial court found that the Tribune had not proved its claim for breach of contract related to plaintiff's hiring of former Tribune employees in violation of the non-solicitation provision of the separation agreement. The trial court found that the non-solicitation provision was overly broad and unenforceable.

¶ 58    Finally, the trial court found that the Tribune had not proved its claim for rescission of the separation agreement related to plaintiff's failure to disclose the material facts of CSE's scheme to hide its consultants' true identities by using pseudonyms. The Tribune's claim failed because

upon learning of the CSE consultants' use of pseudonyms, plaintiff immediately informed Berns and Jurgeto.

¶ 59    First, we address the Tribune's appeal from the trial court's judgment in favor of plaintiff on his complaint for breach of contract. To establish the existence of a valid contract, plaintiff must show: (1) an offer; (2) an acceptance; and (3) consideration. *Van Der Molen v. Washington Mutual Finance, Inc.*, 359 Ill. App. 3d 813, 823 (2005). The essential elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract; (2) performance by plaintiff; (3) breach by defendant; and (4) resultant injury to plaintiff. *Id.*

¶ 60    Neither party on appeal disputes the trial court's finding that the separation agreement was a valid and enforceable contract supported by adequate consideration, pursuant to which the Tribune agreed to make severance payments to plaintiff in return for, among other things, that he abide by the non-solicitation provision. The dispute on appeal centers on the trial court's findings that: (1) plaintiff violated the non-solicitation provision by hiring former employees of the Tribune to join him in his new job at Shutterstock within one year of his separation from the Tribune; but (2) the non-solicitation provision was overly broad and unenforceable, meaning that plaintiff was not bound by it and therefore his hiring of the former Tribune employees did not negate his claim for breach of contract against the Tribune. We proceed to consider each of those findings.

¶ 61    First, we consider the trial court's finding that the non-solicitation provision was overly broad and, thus, unenforceable.

¶ 62    Generally, the standard of review in a bench trial is whether the order or judgment is against the manifest weight of the evidence. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12. However, the enforceability of a restrictive covenant, such as the non-solicitation provision

at issue here, is a question of law, and therefore our review is *de novo*. *Id.*; *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 63 (2006).

¶ 63    The non-solicitation provision is enforceable only if it is reasonable, meaning that it satisfies the following three-prong test: (1) it is no greater than is required for the protection of a legitimate business interest of the employer; (2) it does not impose an undue hardship on the employee; and (3) it is not injurious to the public. *Reliable Fire*, 2011 IL 111871, ¶ 17.

¶ 64    With respect to the first prong, that the non-solicitation provision must be no greater than is required to protect a legitimate business interest of the employer, we note that the Tribune has a legitimate business interest in preventing the solicitation of its employees by a former co-worker in order to maintain a stable work force. *Integrated Genomics, Inc. v. Kyrpides*, 2010 WL 375672, *10 (N.D. Ill. Jan. 26, 2010); *Arpac Corp. v. Murray*, 226 Ill. App. 3d 65, 76 (1992).

¶ 65    Also, an employer can have a legitimate business interest in enforcing a non-solicitation agreement in order to protect its confidential information. *Instant Technology, LLC v. DeFazio*, 2012 WL 2567033, *7 (N.D. Ill June 26, 2012). Caputo testified as to the confidential, sensitive nature of the information accessed by the members of the Tribune's IT department, including information accessed by the CSE consultants. Accordingly, the Tribune had a legitimate business interest in preventing plaintiff from soliciting such employees to come work for him at Shutterstock.

¶ 66    The time limitation of the non-solicitation agreement is "one of the keys to evaluating [its] reasonableness." *Malone v. Cort Furniture Corp.*, 2002 WL 1874819, *1 (N.D. Ill. Aug. 13, 2002). Here, the non-solicitation provision provided that plaintiff was not to solicit or hire current Tribune employees within one year after the termination of his employment with the Tribune, nor was he to hire, within that same one-year time frame, former employees who had worked for the Tribune

in the 12 months prior to the solicitation. We note that non-solicitation agreements of up to two years have been found reasonable and enforceable. *Arpac Corp.*, 226 Ill. App. 3d at 76.

¶ 67     The trial court found, though, that the non-solicitation provision was overly broad because of its limitation on the hiring of *former* Tribune employees. Neither party has cited any cases indicating that such a one-year restriction on the solicitation of an employer's former employees is inherently unreasonable or unenforceable, and we note that courts have upheld one-year restrictions on the solicitation of an employer's former employees. See *Automated Concepts Inc. v. Weaver*, 2000 WL 1134541 (N.D. Ill. Aug. 9, 2000).

¶ 68     We agree with the Tribune that if plaintiff was permitted to solicit its recently separated employees, then he could encourage employees to leave the Tribune's employ and subsequently hire them immediately following their departure, skirting the restrictive covenant. We find that the portion of the non-solicitation provision preventing plaintiff from soliciting and hiring former Tribune employees (including the CSE consultants who had access to the Tribune's confidential information) for one year after his separation achieves the Tribune's legitimate business interest in maintaining a stable work force and protecting its confidential information.

¶ 69     With respect to the second prong of the *Reliable Fire* test, that the non-solicitation provision does not impose an undue hardship on plaintiff, we note that the non-solicitation provision did not prevent plaintiff from continuing to engage in his IT trade; he could continue to recruit and hire any IT professional from anywhere in the country, other than former and current Tribune employees for a one-year period. Even then, plaintiff was not completely foreclosed from recruiting former and current Tribune employees, as the non-solicitation provision provided several exceptions. Specifically, plaintiff was permitted to hire his executive assistant directly from the Tribune, and he was even allowed to hire former and current Tribune employees if they

responded to a general-purpose advertisement or were referred to him by a search firm or employment agency. On these facts, we cannot say that the non-solicitation provision imposed an undue hardship on plaintiff.

¶ 70    With respect to the third prong of the *Reliable Fire* test, that the non-solicitation provision is not injurious to the public, we note that nothing in the record indicates that the public was in any way injured by the agreement's restriction on plaintiff's ability to hire former and current Tribune employees to perform IT work at Shutterstock for one year after his separation. The non-solicitation provision did not diminish the availability of such IT employees to the public at large, as the affected Tribune employees and former employees were free to pursue work for any and all other companies. And, as discussed, the Tribune employees and former employees were not even completely foreclosed from working for plaintiff at Shutterstock during the one-year limitation period; the non-solicitation provision allowed them to work for plaintiff as long as their employment resulted from a general purpose advertisement or from a referral by a search firm or employment agency. No harm to the public exists.

¶ 71    As the non-solicitation provision protected a legitimate business interest of the Tribune, did not impose an undue hardship on plaintiff, and was not injurious to the public, it satisfied the *Reliable Fire* test for reasonableness. Accordingly, the trial court erred in finding that the non-solicitation provision was overly broad and unenforceable.

¶ 72    Next, we consider whether the trial court erred in its factual finding that plaintiff hired former Tribune employees to join him in his new job at Shutterstock within one year of his separation, in violation of the non-solicitation provision.

¶ 73    On review of a bench trial, we will not disturb the trial court's findings of fact unless they are against the manifest weight of the evidence. *Southwest Bank of St. Louis v. Poulokefalos*, 401

Ill. App. 3d 884, 890 (2010). A finding is against the manifest weight of the evidence when an opposite conclusion is apparent or when the findings are unreasonable, arbitrary, or not based on the evidence. *Id.*

¶ 74    The trial court here found that plaintiff had hired former Tribune employees McKenzie, Murray and Prussak to join him at Shutterstock within one year of his separation from the Tribune in violation of the non-solicitation provision. We begin by addressing the trial court's findings with respect to McKenzie and Murray.

¶ 75    At trial, plaintiff testified that McKenzie and Murray called him regarding employment with Shutterstock and that he told them he could not recruit or hire them due to the non-solicitation provision. There was no contrary evidence presented at trial indicating that McKenzie and Murray were hired at Shutterstock in contravention of the non-solicitation provision.

¶ 76    Thus, the trial court's finding that plaintiff violated the non-solicitation provision by hiring McKenzie and Murray to join him at Shutterstock within one year of his separation from the Tribune was against the manifest weight of the evidence.

¶ 77    However, the trial court's finding that plaintiff's hiring of Prussak violated the non-solicitation provision was not against the manifest weight of the evidence. Plaintiff testified on cross-examination that when Prussak applied for a job at Shutterstock, plaintiff recused himself from the HR process in accordance with the non-solicitation provision. Plaintiff was impeached with his amended answers to the Tribune's first set of interrogatories, in which he admitted hiring Prussak to work at Shutterstock. Prussak began work there in January or February 2017, within one year of plaintiff's separation from the Tribune. The impeaching evidence supported the trial court's finding that plaintiff's hiring of Prussak violated the non-solicitation provision.

¶ 78    The Tribune contends that plaintiff's claim for breach of contract based on the Tribune's discontinuance of his severance payments fails, because the payment of the severance payments was contingent on plaintiff's compliance with the valid non-solicitation provision. As plaintiff failed to comply with the non-solicitation provision when he hired Prussak in January or February 2017, he was not entitled to the severance payments.

¶ 79    However, plaintiff counters that his hiring of Prussak occurred *after* the Tribune had materially breached the separation agreement in August 2016 by discontinuing the severance payments. Plaintiff contends that the Tribune's material breach of contract in August 2016 rendered the non-solicitation provision unenforceable at the time he hired Prussak in January or February 2017.

¶ 80    The Tribune does not dispute that it materially breached the separation agreement in August 2016 by discontinuing the severance payments but argues in its reply brief that plaintiff should have complied with the one-year non-solicitation provision and *then* sued for damages.

¶ 81    *C.G. Caster Co. v. Regan*, 88 Ill. App. 3d 280 (1980), is informative. In *C.G. Caster*, Robert J. Regan entered into an employment agreement with the C.G. Caster Company (Caster), which was in the business of investigating and adjusting insurance claims. *Id.* at 281. The employment agreement provided that upon termination, Regan would receive certain monetary benefits. *Id.* The agreement also contained a restrictive covenant that would go into effect upon Regan's separation from the company. *Id.* Regan was terminated on May 6, 1975, and upon termination, he commenced an insurance adjustment business that accepted business within the proscribed area covered by the restrictive covenant. *Id.*

¶ 82    Caster filed suit against Regan seeking damages for his alleged breach of fiduciary duties while an officer and director of Caster, and also because Regan breached the restrictive covenant.

*Id.* Regan replied that he breached no fiduciary duties while employed by Caster, and that he was not bound by the restrictive covenant provision after his termination because Caster did not pay him under the termination clause. *Id.* Regan filed a counterclaim seeking judgment for the amounts due under the termination provisions. *Id.* at 281-82.

¶ 83    The trial court found for Regan on Caster's claims for damages for breach of the restrictive covenant and for breach of fiduciary duties. *Id.* at 282. The court also found for Regan on his claim for termination payments under the contract and entered judgment in the amount of $89,686.19. *Id.* Caster appealed. *Id.*

¶ 84    The appellate court held that Caster's failure to pay termination benefits constituted a material breach of contract that rendered the restrictive covenant no longer binding against Regan. *Id.* at 285. The appellate court affirmed the trial court's judgment in favor of Regan on his claim for termination payments under the contract. *Id.* at 287-88. In effect, the appellate court held that Caster's material breach of its contract with Regan rendered the restrictive covenant against Regan unenforceable, and enabled Regan to sue for damages for Caster's breach.

¶ 85    Similarly, in the present case, the Tribune's material breach of contract in August 2016 rendered the non-solicitation provision unenforceable against plaintiff and enabled plaintiff to bring suit immediately for damages arising from the Tribune's breach. Plaintiff has pleaded and proved all the elements of his breach of contract claim against the Tribune, *i.e.*, the existence of a valid and enforceable contract, performance by plaintiff until the material breach by defendant, and resultant injury to plaintiff when the Tribune stopped making the severance payments. *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 27. Accordingly, we affirm the trial court's judgment in favor of plaintiff on his breach of contract claim against the Tribune.

¶ 86    In its reply brief, the Tribune cites *Kel-Keef Enterprises, Inc. v. Quality Components Corp.*, 316 Ill. App. 3d 998 (2000) for the proposition that plaintiff cannot both be excused from performing under the non-solicitation provision of the contract and receive damages as those remedies are inconsistent. The Tribune forfeited review by failing to raise this argument in its appellant's brief. See Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018). Regardless of the forfeiture, *Kel-Keef* is factually inapposite here as it did not involve an employer's material breach of an employment agreement, and the effect of such a material breach on a restrictive covenant provision in the contract. *C.G. Caster* addressed the effect of an employer's material breach on a restrictive covenant provision, holding that the employer's material breach rendered the restrictive covenant unenforceable and allowed for the employee to immediately sue for damages. *C.G. Caster*, not *Kel-Keef*, is dispositive here.

¶ 87    The Tribune has filed a petition for rehearing on the issue of inconsistent remedies, citing *Hassan v. Yusuf*, 408 Ill. App. 3d 327 (2011), *Douglas Theater Corp. v. Chicago Title & Trust Co.*, 288 Ill. App. 3d 880 (1997), *SJS Investments, Ltd. v. 450 East Partnership*, 232 Ill. App. 3d 429 (1992), and *Bruno Benedetti & Sons, Inc. v. O'Malley*, 124 Ill. App. 3d 500 (1984). The Tribune cited none of those cases in its appellant's brief and so has forfeited review by raising them for the first time on the petition for rehearing. See Rule 341(h)(7). Forfeiture aside, *Hassan*, *Douglas Theater Corp.*, *SJS Investments, Ltd.* and *Bruno Benedetti & Sons* did not address the effect of an employer's material breach of an employment contract on a restrictive covenant provision. For all the reasons previously discussed herein, *C.G. Caster* is dispositive and provides that the Tribune's material breach of the separation agreement rendered the non-solicitation provision unenforceable and allowed plaintiff to immediately bring suit for damages.

¶ 88    Next, we address the trial court's judgment in favor of plaintiff on the Tribune's counterclaims for breach of fiduciary duties. The Tribune claimed that plaintiff breached his fiduciary duties to it by participating in CSE's scheme to allow its consultants to contract with the Tribune using pseudonyms to hide their identities and by failing to adequately review CSE's invoices, thereby allowing CSE and its consultants to overbill the Tribune. To state a claim for breach of fiduciary duties, plaintiff must allege the existence of a fiduciary duty, breach of that duty, and damages proximately caused therefrom. *Indeck Energy Services, Inc. v. Depodesta*, 2019 IL App (2d) 190043, ¶ 74.

¶ 89    The trial court found that plaintiff committed no breach of fiduciary duties with respect to his participation in CSE's scheme to hide its consultants' true identities via the use of pseudonyms, because he immediately informed Berns and Jurgeto about the alleged scheme upon learning of it and was told to continue using the CSE consultants without delay as there was a $275 million dividend hanging in the balance.

¶ 90    The trial court's factual finding was not against the manifest weight of the evidence. Plaintiff testified that Berns hired him to manage the IT-related aspects of the split of the Tribune's publishing and broadcasting divisions and recommended that he speak with DeSimone about hiring CSE to help him. Plaintiff spoke with DeSimone and gave Jurgeto a list of CSE consultants for her to vet; he did not tell the consultants to use pseudonyms to hide their true identities and he did not direct DeSimone to have them use pseudonyms.

¶ 91    Soon after his hiring, plaintiff spoke with the CEO of the entire Tribune company, Peter Liguori, who told him that he had six months to effectuate the IT-related aspects of the split. Liguori told plaintiff that his "number one" responsibility was to effectuate the split so that "the shareholders could see the value." Liguori subsequently held a videoconference broadcast to the

entire company in February 2014, informing all the Tribune employees that plaintiff "was responsible for splitting the company and that [plaintiff] was only accountable to him and [Steven Berns] to make sure that we [met] the [August deadline], because that was the most important thing to the shareholders."

¶ 92    Plaintiff further testified that when he first discovered in January or February 2014 that the CSE consultants were also working for Revlon and were using pseudonyms to hide their identities, he immediately informed Berns, who told him, "I don't care, we need to get this company split, it's the most important thing in the world, it's the most important thing to the shareholders. Don't worry about it, just get back to work and keep this thing on schedule."

¶ 93    Plaintiff's testimony regarding Berns's willingness to continue to employ the CSE consultants, even with the knowledge that they were using pseudonyms, was corroborated by Renn. Renn testified that Berns worked with two of the CSE consultants, Dahake and  Prussak while at Revlon, and that he brought them with him to the Tribune to help him code his Table of Authority. While working at the Tribune, the CSE consultants used pseudonyms, but Berns continued to employ them even though he knew their true identities.

¶ 94    In addition, plaintiff testified that upon learning of CSE's scheme of using pseudonyms to hide its consultants' true identities, he told DeSimone to "go tell procurement immediately." Caputo testified that Jurgeto, who was in charge of investigating the CSE consultants to ensure their suitability for the job, was made aware of the CSE consultants' use of pseudonyms but did nothing to stop it.

¶ 95    On all these facts, we cannot say that the trial court erred in finding that plaintiff committed no breach of fiduciary duty where upon learning of CSE's alleged scheme to use pseudonyms to hide its consultants' identities, he: immediately disclosed the scheme to the Tribune executive to

whom he was accountable; ensured that the director of procurement was also immediately notified; and was told to proceed apace and to continue to use the CSE consultants to effectuate the IT split and earn the resulting $275 million dividend.

¶ 96 The Tribune's claim for breach of fiduciary duties also fails, because it has not shown how it was damaged thereby. Plaintiff, with the help of the CSE consultants, successfully completed the IT-related aspects of the split under budget and by the August 2014 deadline, thereby enabling the payment of the $275 million dividend to the Tribune shareholders. Far from being damaged by plaintiff's participation in the scheme of using CSE consultants who hid their employment with Revlon via the use of pseudonyms, the Tribune received a $275 million benefit.

¶ 97 The Tribune next argues that plaintiff breached his fiduciary duties to it by failing to adequately review the CSE consultants' invoices, thereby allowing them to overbill the Tribune for hours that were not actually worked. The Tribune's claim of breach of fiduciary duties fails based on the trial court's rejection of the testimony of the Tribune's expert, Mark Pearson, a forensic accountant and certified fraud examiner. Pearson had performed a forensic accounting of CSE's billing of the Tribune, and he reviewed CSE's invoices, time sheets and 1099 tax forms.

¶ 98 Pearson testified on direct examination that he determined that 13 CSE consultants collectively overbilled the Tribune $190,337.17 for 1,252.74 hours that they had not actually worked. However, on cross-examination, Pearson admitted that he had not seen a complete set of CSE's time sheets and that he had not reached an opinion as to whether CSE overbilled the Tribune or whether CSE had "fraudulently billed" the Tribune.

¶ 99 The trial court found that "Pearson's work can best be described as incomplete and of little value to the Court because it was based upon only partial information because a complete set of

timesheets was not available." The trial court made no finding as to the amount of money that CSE overbilled the Tribune.

¶ 100    We defer to the trial court's judgment regarding the value of Pearson's testimony (*Karris v. Water Tower Trust & Savings Bank*, 72 Ill. App. 3d 339, 353 (1979)), and find that the Tribune failed to show the amount, if any, that it was overbilled by the CSE consultants. Accordingly, the Tribune has failed to show any damages by plaintiff's alleged breach of his fiduciary duties with respect to his oversight of the CSE consultants' invoices. In the absence of damages, the Tribune's claim of breach of fiduciary duties fails (*Indeck*, 2019 IL App (2d) 190043, ¶ 74). Therefore, we affirm the judgment in favor of plaintiff.

¶ 101    Next, we address the trial court's judgment in favor of plaintiff on the Tribune's counterclaims against plaintiff for fraud and aiding and abetting fraud in connection with CSE's scheme to hide its consultants' true identities by using pseudonyms. To plead fraud, the Tribune must show: (1) a false statement of fact; (2) knowingly made by plaintiff; (3) with the intent to induce the Tribune to act; (4) the Tribune's justifiable reliance on plaintiff's false statement; and (5) that such reliance caused the Tribune to suffer damages. *Bosch v. Northshore University Health System*, 2019 IL App (1st) 190070, ¶ 107. As discussed earlier in this order, the Tribune has failed to show a false statement of fact, where plaintiff immediately disclosed CSE's alleged scheme to his superior, Berns, and to Jurgeto, and was told by Berns not to worry and to proceed with his work and with his use of the CSE consultants. Also, as discussed earlier in this order, the Tribune has failed to show any damages. Therefore, we affirm the judgment in favor of plaintiff.

¶ 102    We also affirm the trial court's judgment in favor of plaintiff on the Tribune's counterclaim that plaintiff engaged in a civil conspiracy with CSE to defraud the Tribune. As the underlying

fraud claim fails, the civil conspiracy claim necessarily fails too. See *Lewis v. Lead Industries Ass'n, Inc*., 342 Ill. App. 3d 95, 107 (2003).

¶ 103    We affirm the trial court's judgment in favor of plaintiff on the Tribune's counterclaim for unjust enrichment. To state a claim for unjust enrichment, the Tribune must allege that plaintiff has unjustly retained a benefit to the Tribune's detriment and that plaintiff's retention of the benefit violates the fundamental principles of justice, equity, and good conscience. *Stefanski v. City of Chicago*, 2015 IL App (1st) 132844, ¶ 47. The Tribune has failed to show how the salary and benefits plaintiff received were unjust and in violation of the principles of justice, equity, and good conscience, where as a result of his work the Tribune successfully completed the IT-related aspects of the split of the publishing and broadcasting divisions under budget and by the August 2014 deadline, thereby enabling the Tribune's stockholders to earn a $275 million dividend.

¶ 104    We affirm the trial court's judgment in favor of plaintiff on the Tribune's counterclaim against plaintiff for breach of contract in relation to his failure to abide by the non-solicitation provision. For all the reasons discussed earlier in this order, the Tribune's claim of breach of contract fails.

¶ 105    We affirm the trial court's judgment in favor of plaintiff on the Tribune's counterclaim for rescission of the separation agreement based on plaintiff's fraudulent concealment of the CSE consultants' use of pseudonyms. The Tribune's claim of fraud fails where, upon learning of the CSE consultants' use of pseudonyms, plaintiff immediately informed Berns and Jurgeto, and was told to continue using the CSE consultants in order to effectuate the split of the publishing and broadcasting divisions, and where the Tribune suffered no damages. In the absence of an actionable claim of fraud, the Tribune's rescission claim is without merit.

¶ 106   We proceed to address plaintiff's cross-appeal. Plaintiff contends that the trial court erred by granting summary judgment in favor of the Tribune on his claim that the Tribune owes him separation payments under the Wage Act (820 ILCS 115/5 (West 2016)). Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). The trial court's grant of summary judgment is subject to *de novo* review. *Schicheng Guo v. Kamal*, 2020 IL App (1st) 190090, ¶ 17.

¶ 107   "The purpose of the Wage Act is to provide employees with a cause of action for the timely and complete payment of earned wages or final compensation." *Andrews v. Kowa Printing Corp.*, 351 Ill. App. 3d 668, 675 (2004).

¶ 108   Section 2 of the Wage Act provides:

"For all employees, other than separated employees, 'wages' shall be defined as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties ***. Payments to separated employees shall be termed 'final compensation' and shall be defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2 (West 2016).

¶ 109   Section 5 of the Wage Act provides:

"Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." *Id*. § 5.

¶ 110   In addition, section 4 of the Wage Act provides that the employer pay the employee the wages earned during a semi-monthly or bi-weekly pay period "not later than 13 days after the end of the pay period in which such wages were earned." *Id.* § 4.

¶ 111   Based on these provisions, this court has held that final compensation is owed under the Wage Act at the time of separation of employment or the next regularly scheduled payday (or in the case of semi-monthly or bi-weekly payments, 13 days after the end of the pay period) only when the employer has received something from the employee during the latter's employment for which it has not yet paid. *Majmudar v. House of Spices (India), Inc.*, 2013 IL App (1st) 130292, ¶ 15. Final compensation under the Wage Act does not include payments promised in contemplation of future services that have not yet been provided. *Prettyman v. Commonwealth Edison Co.*, 273 Ill. App. 3d 1090, 1096 (1995).

¶ 112   In the present case, the severance payments at issue were not owed to plaintiff at the time of separation because they were not payments to plaintiff for services already provided by him, but instead were payments in contemplation of his future compliance with the non-solicitation agreement. Accordingly, the trial court properly found that the severance payments were not subject to a claim under the Wage Act. We affirm the grant of summary judgment in favor of the Tribune.

¶ 113   For all the foregoing reasons, we affirm on the appeal and on the cross-appeal. As a result of our disposition of this case, we need not address the other arguments on appeal.

¶ 114   Affirmed.